# EXHIBIT 1

**ROLNICK KRAMER SADIGHI LLP**
Marc B. Kramer
Attorney ID No. 016241987
300 Executive Drive, Suite 275
West Orange, NJ 07052

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
John B. Quinn
C. Dabney O'Riordan
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

James C. Tecce
51 Madison Avenue
New York, New York 10010

Stacylyn Doore
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199

| | |
|---|---|
| CHATHAM ASSET MANAGEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ADVISER COMPLIANCE ASSOCIATES, LLC D/B/A ACA COMPLIANCE GROUP,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. _____<br>CIVIL ACTION<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Chatham Asset Management, LLC ("**Chatham**" or "**Plaintiff**"), a limited liability corporation formed under the laws of Delaware with its principal place of business at 26 Main Street, Suite 204, Chatham, County of Morris, New Jersey, by way of Complaint against Defendant, Adviser Compliance Associates, LLC, d/b/a ACA Compliance Group ("**ACA**" or "**Defendant**"), states as follows:

1

## PRELIMINARY STATEMENT

1.     Chatham engaged ACA to help establish best-in-class compliance policies and procedures.  Chatham selected ACA based on ACA's unabashed proclamation that it possessed expertise in the field and the skill to perform the engagement competently.  ACA, however, failed Chatham miserably.  It gave incorrect trading advice and conducted defective mock exams which Chatham relied on in making hundreds of trades.  Specifically, Chatham sought out guidance from ACA regarding a trading issue that had only recently become relevant in light of the new clients Chatham was advising.  Not only did ACA give Chatham bad advice at the outset as to how to conduct its trades, but ACA perpetuated that bad advice and the harm it caused by missing the issue when performing several mock exams.  In subsequent years, ACA repeatedly advised Chatham when performing its audits that ACA saw no issues with Chatham's trading.  ACA's advice and audit failures ultimately embroiled Chatham in a dispute with the United States Securities and Exchange Commission ("**SEC**") that for obvious reasons proved costly and harmed Chatham's professional reputation as an investment adviser.  Put simply, ACA did not do its job, and the results have proven harmful to Chatham.  It brings this suit rightfully seeking redress for ACA's gross negligence and incompetence.

2.     Before it engaged ACA, Chatham had an existing internal compliance program that included its own chief compliance officer.  Though it was not required to have a compliance consultant, Chatham nonetheless retained ACA to ensure it had the best ability to remain current in its compliance program; could ask questions from a compliance expert; and was prepared for any examinations the SEC may conduct.  Beginning in 2013, Chatham entered into the business line of providing sub-advisory services to publicly-registered, multi-manager, liquid alternative

funds (or "**LAFs**").[1]  Because this subjected Chatham to a new and complex regulatory regime under the Investment Company Act of 1940 (the "**ICA**"), Chatham thought it prudent to fortify its existing compliance program and enlisted ACA's help.  Throughout the relevant period, ACA and Chatham entered into various advisory agreements and specific statements of work.

3.      The advice and mock audits relevant to this dispute took place starting in or around March 2016, when Chatham raised a question about how to act consistently with legal restrictions in making certain trades imposed under the ICA.  In response, one of ACA's founders advised Chatham that it could perform the trades in question without being subject to the SEC's cross-trading rules by trading with the market using brokers.  ACA also counseled Chatham that if the trades were executed on the same day, then Chatham should use more than one broker; but, if the trades were done over two or more days, then Chatham could use a single broker (hereinafter, the "**Rebalancing Trades**").

4.      ACA's advice was flatly incorrect and an inaccurate interpretation of the cross-trading rules under the ICA.  What is worse, each year ACA doubled-down on that mistake when it performed Chatham's annual mock audits pursuant to the parties' engagement agreements.  ACA failed to identify the offending Rebalancing Trades in ACA's annual compliance reviews for 2016 and 2017, despite having included Chatham's trading practices within the scope of its reviews. ACA's oversight is particularly stunning considering that Chatham (a) had specifically raised with ACA the question of how to perform these trades in a compliant manner and (b) gave ACA unfettered access to all of Chatham's trading records for this purpose, including every document ACA ever requested during years of mock audits, all trading data, emails, and Bloomberg chats. Notwithstanding, ACA never raised a single issue with respect to Chatham's trading practices

---

[1]      Chatham exited this business line entirely in 2020.

during the mock exams and instead signed-off on the Rebalancing Trades that Chatham had implemented based on ACA's incorrect advice.

5.      In the summer of 2018, the Rebalancing Trades attracted the attention of SEC Examination Staff, whose one examination identified over 100 offending cross-trades from 2016 to 2018.  These 100 trades, however, had been the subject of mock audits ACA performed—and ACA did not flag any of them.  What is more, at the time ACA supposedly was supporting Chatham and its outside counsel in connection with the SEC Examination.  Yet, ACA failed to identify the Rebalancing Trades as something that would be an obvious priority for the SEC before Chatham's first SEC Examination.  In the face of mounting regulatory scrutiny, ACA did nothing but simply reaffirm its inept advice.  This resulted in a disastrous second visit by the SEC during which the SEC Examination Staff honed in on the Rebalancing Trades.

6.      Simply put, ACA failed to perform the very task Chatham engaged it to perform, that is, to provide advice on how to ensure Chatham acted in compliance with the SEC's rules and regulations and to provide annual support to maintain that compliance by performing Chatham's audits properly.  ACA did none of those things.  Instead, ACA's gross negligence placed Chatham in the SEC's cross-hairs.   After the SEC Examination, the SEC's Enforcement Division commenced a lengthy investigation culminating in a damaging settlement—reflected in an Order specifically referring to ACA's advice.

7.      ACA's grave failures have resulted in tens-of-millions of dollars in legal fees, lost business, reputational harm, and other damages, and support claims for gross negligence, negligent misrepresentation, breach of contract, and breach of fiduciary duty.  Chatham paid ACA approximately $1.7 million in fees and as a consequence of ACA's misconduct, lost no less than $100 million, including, without limitation $75 million in advisory fees; additional amounts

Chatham must now pay to resolve an SEC Enforcement matter, e.g., $11 million in disgorgement, $3.375 million in prejudgment interest; and amounts reflecting the reputational harm ACA caused Chatham to be proven at trial.

8.     Before commencing this lawsuit, Chatham approached ACA, hoping ACA would acknowledge responsibility for its failure.  ACA responded with pure hubris, accusing Chatham of seeking to divert attention from its own regulatory issues by blaming ACA for Chatham's conduct.  ACA could not be more wrong.

<u>**PARTIES**</u>

9.     Chatham is a limited liability corporation formed under the laws of Delaware with its principal place of business in Chatham, New Jersey.  Chatham is registered with the SEC, and advises and manages a number of hedge funds, including:  Chatham Asset High Yield Master Fund, Ltd.; the Chatham Asset Private Debt and Strategic Capital Fund, LP; the Chatham Fund, LP; the Chatham Everest Fund, L.P.; and the Chatham Eureka Fund, LP.  Between 2013 and 2020, Chatham also managed the LAFs, a type of mutual fund that seeks to implement hedge fund-like strategies while maintaining daily liquidity.  Chatham's total assets under management are approximately $8.6 billion.

10.     Upon information and belief, ACA is a limited liability company incorporated under the laws of the District of Columbia, and maintains a place of business at 2180 Headquarters Plaza, West Tower, 5th floor, Morristown, NJ 07960.  ACA purports to be the leading governance, risk, and compliance adviser in the financial services industry.

11.     Upon information and belief, ACA's parent company, ACA Compliance Group Holdings, LLC ("**<u>ACA Holdings</u>**"), is a limited liability company registered as a foreign business in the State of New Jersey.

5

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action based on Plaintiff Chatham's extensive business in this State, the extensive business of Defendant ACA and its parent ACA Holdings in this State, and the wrongful actions of ACA that were committed in this State, and that directly and proximately caused Plaintiff's damages.

13.     ACA and its parent ACA Holdings have purposefully, systematically, and continually directed contacts to and conducted business in New Jersey.  ACA and ACA Holdings have engaged and currently engage in business operations in New Jersey, including, but not limited to, the following:

a.      ACA maintains an office in Morristown, New Jersey.

b.      ACA Holdings, ACA's parent company, is a limited liability company registered as a foreign business in the State of New Jersey.

c.      ACA entered into a business relationship and contractual agreement with Chatham, a Delaware corporation with its principal place of business in New Jersey.  ACA's extensive business dealings and contacts with Chatham in New Jersey have extended over a nearly 12-year period, beginning in or about November 1, 2010.

## FACTUAL ALLEGATIONS

I.     CHATHAM ENGAGED ACA IN AN EFFORT TO DEVELOP A WORLD-CLASS COMPLIANCE PROGRAM

14.     In 2003, Chatham began as an adviser to private funds serving both institutional investors and high net worth individuals as investors in the funds.  After a decade of significant growth and with additional assets under management, Chatham sought to become a registered investment adviser ("**RIA**") with the SEC.  In connection with becoming an RIA, Chatham sought to ensure that it would be in compliance with the rules applicable to RIAs, including the creation

of a compliance program in accordance with Rule 206(4)-(7) of the Investment Advisers Act of 1940 ("**Investment Advisers Act**").

15.     Chatham engaged the purported leader in the compliance field:  ACA.  ACA was founded in 2002 by four former SEC regulators and a former state regulator for the purpose of providing investment advisers with expert guidance on existing and new regulations.  ACA provides governance, risk, and compliance solutions to assist private fund advisers, RIAs, and other types of regulated entities.

16.     At all times, Chatham had two different agreements with ACA, as explained below, each listing a specific set of services ACA would provide Chatham.  The first agreement—known as the "non-privileged agreement"—was entered into directly between ACA and Chatham, effective as of November 1, 2010.   The second agreement—known as the "privileged agreement"—was entered into between ACA, Chatham's outside counsel, Seward & Kissel, LLP ("**S&K**"), and Chatham, also effective as of November 1, 2010.  As explained below, the two different agreements were amended and renegotiated on a number of occasions during the relevant period.

### A.     NON-PRIVILEGED AGREEMENT AND SERVICES

17.     The "non-privileged" agreement was entered into directly between ACA and Chatham and obligated ACA to provide ongoing compliance support, including unlimited customized telephone consulting with ACA's compliance professionals to answer compliance and trading questions.  Under the non-privileged agreement, ACA agreed to provide Chatham with SEC form filing support, including preparing and submitting the Investment Adviser Registration Filing ("**Form ADV**").  The first non-privileged agreement was effective as of November 1, 2010.  See **Exhibit A**, Consulting Agreement, dated November 1, 2010 ("**2010 Non-Privileged Agreement**").

### B.   PRIVILEGED AGREEMENT AND SERVICES

18.     The "privileged agreement" was designed so that ACA would perform certain services at the direction of outside counsel, S&K, with Chatham as a third-party beneficiary and the party responsible for paying ACA's fees.  This arrangement ensured that ACA's work would be protected under the attorney-client and work product privileges.  These privileged services included the annual compliance program review, SEC Examination support, and review of policies, procedures, and compliance documents.  See **Exhibit B**, Consulting Agreement, dated November 1, 2010 (the "**2010 Privileged Agreement**").

19.     The first privileged agreement was effective as of November 1, 2010.  It provides that "ACA will conduct an annual review of [Chatham's] compliance program, including a review of [Chatham's] policies, procedures, and other compliance-related documents, as required by Rule 206(4)-7 under the Advisers Act…."  2010 Privileged Agreement § 1.1.  ACA touts this service on its website: "[o]ur team will conduct these inspections in very similar circumstances to an actual [SEC] exam.  Following an ACA mock exam, your firm will know what to expect and will be in a position to address any deficiencies."  See ACA, Compliance Program Reviews, Mock Exams, and Gap Analysis, https://www.acaglobal.com/our-solutions/compliance-consulting/compliance-program-reviews-mock-exams-and-gap-analysis.

20.     The 2010 Privileged Agreement further obligates ACA to "review [Chatham's] relevant compliance documents…."  2010 Privileged Agreement § 1.2.

21.     Pursuant to the 2010 Privileged Agreement, ACA agreed to provide SEC Examination support, agreeing to review and assess documents, to assist with the preparation of an initial presentation to be provided to the SEC Examination staff, and to prepare Chatham's employees for interviews.  2010 Privileged Agreement § 1.5.

22.     The 2010 Privileged Agreement was amended on May 30, 2013, to include additional services and compensation to be provided by and to ACA with respect to the ICA (the "**2013 Privileged Amendment**").  See **Exhibit C**, Consulting Agreement, dated May 30, 2013.

23.     Pursuant to the 2013 Privileged Amendment, ACA agreed to draft and/or revise Chatham's compliance policies and procedures with respect to the ICA.  2013 Privileged Amendment § 1.

24.     The 2013 Privileged Amendment further obligates ACA to conduct an annual review of Chatham's compliance program in accordance with, and as required by, Rule 38a-1 under the ICA.  The 2013 Privileged Amendment was terminated and replaced by a revised Consulting Agreement between ACA and S&K, with Chatham as a third-party beneficiary, effective as of November 1, 2020—after the advice and mock exams relevant to this litigation. See **Exhibit D**, Consulting Agreement, dated November 1, 2020.

## II.     CHATHAM'S INVESTMENT STRATEGY WAS HIGHLY SUCCESSFUL

25.     From its inception, Chatham distinguished itself as an active investment manager that invested in alternative asset classes such as high-yield bonds, leveraged loans, and credit derivatives.  Chatham also invested in "special situations" in the crossover, distressed debt, and credit markets.  Chatham's central investment philosophy seeks to exploit both fundamental and technical inefficiencies in the pricing of leveraged credits across the capital structure through identification and active trading to generate returns and manage risk.  Its investment strategy is characterized by a willingness to take concentrated positions in credits issued by companies that are distressed or otherwise undergoing difficult business transitions in circumstances where the portfolio manager believes the long-term intrinsic value of the company is under-recognized by the broader market.

26.     At the time Chatham was founded in 2003, its business was focused entirely on managing assets through privately offered high-yield funds or managed accounts. Chatham became a registered investment adviser pursuant to the Investment Advisers Act on March 30, 2012. In 2013, Chatham expanded its client base and began providing sub-advisory services to publicly-registered, multi-manager LAFs—liquid alternative funds. In so doing, the sponsors advised Chatham that they wanted Chatham to give the LAFs the benefit of its best ideas and to essentially replicate for the LAFs the same portfolios that Chatham was managing on behalf of its privately offered funds. The sponsors of the LAFs were aware that, consistent with Chatham's investment strategy, Chatham would, from time to time, take concentrated positions in thinly traded securities, and understood the risks associated with that strategy. Because the LAF's (unlike the private funds) were registered investment companies, Chatham's management of those sub-portfolios had to also comply with the ICA and the rules thereunder, which is a highly technical regulatory regime.

27.     The decision to begin managing sub-portfolios on behalf of LAFs gave rise to certain portfolio management challenges for Chatham that had not previously existed when Chatham's business was confined to managing its private funds. In particular, the LAFs' daily (as opposed to monthly) liquidity requirements, more volatile cash flows, and more restrictive issuer and industry concentration limits gave rise to a need to rebalance the LAFs' portfolios more frequently than had previously been the case. For example, certain LAFs had limitations on how much of their investments could be made in a particular industry or with a specific issuer. That challenge was especially acute for high-conviction positions where the investment goal was to maximize the LAFs' holdings in such securities. Portfolio rebalancing also presented an issue in light of the constraints on cross trades applicable to LAFs under the ICA.

28.    One such high-conviction, high-concentration investment Chatham made was in the aggregated print media publisher, American Media, Inc. ("**AMI**," now known as A360 Media, LLC), a wholly owned subsidiary of AMI Parent Holdings LLC ("**AMI Parent**").  Around 2014, Chatham recognized a significant growth opportunity in AMI, which was well positioned to capitalize on a rapid consolidation of the magazine distribution industry that was and is ongoing.  Chatham expected AMI to profit from the cost reductions and greater efficiencies that would be realized from the emergence of a more integrated business model for the distribution of magazines and other non-magazine products to retail distributors.  Further, Chatham believed the market had underestimated AMI's ability to identify and acquire undervalued brands and realize above-market returns through effective management and consolidation, and that, through foreseeable restructurings of the company and its capital structure, bond and equity holders would realize substantial profit.  Thus, Chatham made an investment bet on AMI's high-yield bonds ("**AMI Bonds**") and acquired nearly 80 percent of AMI Parent's equity.

29.    Between January 2016 and December 2018 (the "**Relevant Period**"),[2] notwithstanding Chatham's favorable view of the AMI investment, it became necessary for Chatham to "rebalance" certain of its funds under management by selling some of the AMI Bonds, especially since Chatham operated its LAFs at or close to their issuer and industry concentration limits—as was disclosed in public regulatory filings on which ACA worked—in large part due to the holdings in AMI Bonds.  Generally, when Chatham was forced to sell AMI Bonds in these circumstances, Chatham still believed in the merits of the investment and would not otherwise have sold the bonds if it were not for the portfolio restrictions in the specific funds.  Thus, in many instances, Chatham viewed the purchase of AMI Bonds to be in the best interest for certain other

---

[2]    Chatham exited this business line entirely in 2020.

clients to buy.  During the Relevant Period, Chatham engaged in transactions in the AMI Bonds

that resulted in one Chatham fund selling the AMI Bonds, and a different Chatham fund purchasing

the AMI Bonds, through various broker-dealers.

## III.   ACA PROVIDED GROSSLY NEGLIGENT ADVICE REGARDING REBALANCING TRADES

30.    The Rebalancing Trades created compliance challenges relating to an investment

adviser's selling securities from one fund and buying for another fund, especially when one of the

funds was a registered investment company under the ICA.[3]   For example, the volume and

frequency of the Rebalancing Trades would make obtaining exemptions under Rule 17a-7 for each

rebalancing trade impractical.[4]

---

[3]    Section 17(a)(1) of the ICA prohibits transactions by an affiliated person of a registered
investment company to knowingly sell any security to such registered company or any
company controlled by the registered company, "unless such sale involves solely
(A) securities of which the buyer is the issuer, (B) securities of which the seller is the issuer
and which are part of a general offering to the holders of a class of its securities, or (C)
securities deposited with the trustee of a unit investment trust or periodic payment plan by
the depositor thereof" or, under §17(a)(2), to knowingly purchase from such registered
company any security or other property unless that person files an application with the SEC
for an order exempting the proposed transaction pursuant to §17(b).

[4]    SEC Rule 17a-7 exempts transactions between regulated investment companies ("**RICs**")
and affiliated persons from application of §17(a) if:

- the transaction is a purchase or sale for no consideration other than cash and for
which market quotes are readily available;

- the transaction is effected at the independent current market price;

- the transaction is consistent with the RIC's policies;

- no brokerage commission or other fee is paid in connection with the transaction;

- the BOD of the RIC has adopted procedures governing such transactions and
satisfies certain fund governance standards;

- the RIC maintains written copies of such procedures; and

- the RIC maintains written records of each transaction setting forth a description of
the transaction, person on the other side of the transaction, terms of the transaction,
and information or materials used by BOD to determine such transactions were
compliant with relevant procedures.

31.     Recognizing these complications, in or around March 2016, Chatham's Chief Operating Officer and Chief Compliance Officer sought compliance advice from ACA regarding how best to effect these transactions in compliance with SEC rules and regulations specifically alerting ACA to the potential issues with Rebalancing Trades.  Chatham's Chief Operating Officer and Chief Compliance Officer spoke with ACA's senior partner on the Chatham engagement.  This senior partner was one of the founding partners at ACA, and at that time had more than 14 years of experience as a Partner at ACA.  Prior to that, he had spent nearly five years at the SEC as a Staff Accountant.  In sum and substance, ACA's Co-founder and lead engagement partner for Chatham told Chatham's Chief Operating Officer and Compliance Officer that Chatham could engage in these trades by trading with the market using brokers to conduct the trades.  He added that if the Rebalancing Trades were executed on the same day, Chatham should use more than one broker, but if the trades were done over two or more days, Chatham could use a single broker.  By trading in this manner, he explained that the brokers were taking on the risk of owning the bonds, thereby avoiding a cross trade.  This advice was specifically referred to in the SEC Order.[5]

32.     At no point did ACA's Co-founder and lead engagement partner for Chatham suggest there was risk associated with following his trading and compliance advice, that the advice was contrary to SEC precedent, or that the SEC might insist that a Rule 17a-7 exemption be sought for such trading.

---

[5]     See Order Instituting Administrative And Cease-And-Desist Proceedings Pursuant To Section Sections 203(e), 203(f), And 203(k) Of The Investment Advisers Act Of 1940, And Sections 9(b) And 9(f) Of The Investment Company Act Of 1940, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order, dated April 3, 2023 (the "**SEC Order**") ¶ 18.

33.     Chatham reasonably followed ACA's advice and conducted the Rebalancing Trades by using multiple brokers for same-day trades and a single broker for trades done over multiple days.

34.     Unbeknownst to Chatham, ACA's advice contradicted a series of SEC precedents in which the SEC had rejected the "interpositioning" of brokers to avoid the prohibitions of the cross trade rules.  Interpositioning is the placing of another broker-dealer in between the customer and the best market, and the SEC expressly concluded "**that the interpositioning of a dealer in these [cross trading] transactions does not remove them from the prohibitions of section 17(a).**"  Exemption of Certain Purchase or Sale Transactions Between a Registered Investment Company and Certain Affiliated Persons Thereof, SEC Rel. No. IC-11136, at n.10 (Apr. 21, 1980) (the "**SEC Release**") (emphasis added).

35.     ACA, holding themselves out as the ultimate compliance experts for investment adviser firms, should have been aware of the SEC precedents, including the SEC Release.  This is especially true when at or around this time, there were a number of enforcement actions of which ACA should have been aware and that should have informed the advice they provided ACA and the manner in which ACA performed Chatham's audits.[6]

36.     Instead, ACA gave Chatham the wrong advice and failed to properly perform Chatham's annual audits.  In so doing, ACA exposed Chatham to extensive regulatory risk, which further compounded and exacerbated its gross negligence.

---

[6]     See In the Matter of Western Asset Management, Co., SEC Rel. No. IC-30893 (Jan. 27, 2014) ("The interpositioning of a dealer in these transactions does not remove them from the prohibitions of Section 17(a)."); In the Matter of Morgan Stanley Investment Management Inc. and Sheila Huang, SEC Rel. No. IC-31947 (Dec. 22, 2015) ("interpositioning a dealer in cross transactions does not remove the cross transactions from the prohibitions of Section 17(a)").

## IV.    CHATHAM REASONABLY RELIED UPON ACA'S ADVICE IN ARRANGING ITS REBALANCING TRADES

37.     On March 15, 2016, Chatham's Chief Operating Officer and Chief Compliance Officer conveyed ACA's advice to Chatham's founder and Managing Partner, Mr. Melchiorre. Relying on ACA's advice, Mr. Melchiorre executed the Rebalancing Trades in the manner recommended by ACA's Co-founder and lead engagement partner for Chatham.

38.     Because Mr. Melchiorre was following the advice of ACA, Mr. Melchiorre and Chatham believed, at all times, that the trades were compliant.  Chatham's reliance on ACA's advice was eminently reasonable.  Among other things, ACA holds itself out as *the* leading governance, risk, and compliance advisor in the financial services industry.  Unfortunately, ACA's advice with respect to the cross trades was completely wrong and contrary to established SEC precedent.

## V.    ACA FAILED PERSISTENTLY TO DETECT HUNDREDS OF RELEVANT CROSS TRADES WHEN PERFORMING CHATHAM'S ANNUAL AUDITS

39.     During the Relevant Period, as part of its compliance support services, ACA performed annual compliance reviews and annual mock audits.  Those reviews and audits included a broad review for which Chatham provided all of its trades to ACA.  Their purpose was to identify issues relevant to Chatham's compliance with the Investment Advisers Act, the Investment Company Act, Chatham's internal policies and procedures, industry best practices, common practices among Chatham's peers, and anticipated regulatory expectations.  After each annual review, ACA provided a "Findings and Recommendations Report" that identified "Issues" (items that ACA believed may require action from Chatham) and "Findings and Recommendations," with each item's risk coded from low to moderate to high.

40.     In order to conduct its annual review, among other things, ACA reviewed Chatham's books and records, written policies and procedures, and documentation regarding

implementation of policies, and interviewed key Chatham personnel. ACA made liberal requests for information from Chatham regarding all of its trades, and Chatham always supplied such information without condition or reservation, including information about the Rebalancing Trades. ACA had complete and unfettered access to all market trades conducted by Chatham because Chatham used ACA's North Point software to manage its trade allocation system. ACA also had access to Chatham's electronic communications and Bloomberg chats.

## VI.   ACA DID NOT RAISE ANY CONCERNS ABOUT RELEVANT TRADES WHEN PERFORMING AUDITS

41.    At no point during the Relevant Period did ACA raise any concerns about the manner in which the Rebalancing Trades were executed or the volume or frequency of such trades.

42.    In January 2017, ACA conducted a compliance review of Chatham, during which it reviewed Chatham's books and records from January 1, 2016 through December 31, 2016, including documents related to Chatham's trading and portfolio management—indeed, ACA had access to Chatham's complete trading system. ACA also conducted on site review of Chatham over the course of four full days.

43.    In May 2017, ACA provided Chatham with its findings from its review. ACA specifically noted that its review included Chatham's compliance with the ICA, as well as an assessment of Chatham's policies and procedures related to trading practices. ACA also noted that cross trades were a trading issue generally relevant to Chatham.

44.    ACA ultimately concluded that there were no notable issues with respect to Chatham's written trading policies and procedures, and cross trades are not listed in the Findings and Recommendations section of the 2017 report.

45.   At the time the 2017 report had been issued, Chatham had been conducting the Rebalancing Trades in accordance with ACA's recommendations for over a year.  But, here again ACA's work was deficient and grossly negligent.

46.   Once again, in January 2018, ACA conducted a compliance review of Chatham, during which it reviewed Chatham's books and records from January 1, 2017 through December 31, 2017, including documents related to Chatham's trading and portfolio management—once again, ACA had access to Chatham's complete trading system.  ACA also conducted another on site review of Chatham over the course of four full days.

47.   In June 2018, ACA provided Chatham with its findings from its review.  Once again, ACA specifically noted that its review included an assessment of Chatham's policies and procedures related to trading practices, and that cross trades were a trading issue generally relevant to Chatham.

48.   ACA ultimately concluded for the second year in a row that there were no notable issues with respect to Chatham's written trading policies and procedures, and cross trades are not listed in the Findings and Recommendations section of the 2018 report.  Indeed, in the 2018 report, ACA said there were no notable issues with respect to Chatham's internal control policies and procedures related to its handling of cross trades.

49.   According to the SEC, between January 2016 and December 2018, the hundreds of Rebalancing Trades made by Chatham in accordance with ACA's advice were unlawful cross trades.  Throughout the Relevant Period, Mr. Melchiorre was acting on the advice of ACA, which held itself out as an expert in compliance and trading, and assured Chatham that the trades were compliant.

50.     Thus, despite its claim to be a market leader in compliance issues, ACA was grossly negligent in performing its annual compliance reviews for the years 2016 and 2017 by failing to warn Chatham that hundreds of trades could be deemed impermissible cross trades by the SEC. ACA failed to even identify the issue—even though Chatham had specifically asked about it.  A compliance adviser exercising the slightest degree of care in its performance of conducting annual compliance reviews would have detected that these Rebalancing Trades would likely be the subject of SEC scrutiny.

## VII.    SEC EXAMINATION

51.     On May 17, 2018, Chatham received a letter notifying it that SEC Examination Staff would visit its offices to conduct an examination on July 9 – 11, 2018.  The SEC letter requested certain information and documents that would be reviewed during the examination.  The SEC also requested to speak with a number of Chatham employees.

52.     This was the first SEC examination Chatham had ever undergone.  Pursuant to the terms of the 2010 Privileged Agreement, Chatham's Chief Operating Officer and Chief Compliance Officer, sought out and relied upon the advice of ACA to assist with the examination.

53.     ACA's incompetence failed Chatham at a critical time, that is, when the SEC Examination began with respect to the very trades Chatham consummated based on ACA's instruction.  In June 2018, Chatham's Chief Operating Officer and Chief Compliance Officer conducted a "pre-exam" call to familiarize the SEC with Chatham's functions—a call that ACA attended.  During the pre-exam call, the SEC specifically asked whether Chatham conducted cross trades.

54.     Even after the SEC specifically raised the cross trading question, at no time did ACA raise with anyone at Chatham an issue that should have been obvious to ACA, as the purported leading experts in this area, including SEC examinations, i.e., that the Rebalancing

18

Trades would be a focus for the SEC Office of Compliance Inspection and Examinations and that they would view such trades as cross trades subject to Rule 17a-7.

55.     Had ACA acted with any degree of care, ACA would have known that the SEC's Office of Compliance Inspection and Examinations had specifically publicly announced "assess[ing] controls surrounding cross-transactions, particularly with respect to fixed income securities," as a priority in 2017.  See SEC: Office of Compliance Inspection and Examinations, Examination Priorities for 2017, https://www.sec.gov/files/national-examination-program-priorities-2017.pdf, 3.  Indeed, ACA was familiar with the 2017 Exam Priorities but failed again to appropriately advise and prepare Chatham.

56.     ACA representatives were present for the entirety of the SEC Examination Staff's site visit in July 2018.  ACA's Co-founder and lead engagement partner for Chatham was present during the visit and attended the Examination Staff's meetings with Chatham representatives to help field questions.

57.     By the end of the week, the SEC Examination Staff had focused its inquiries on the AMI Rebalancing Trades.  ACA remained unmoved.  It was not until the Staff made clear they would return for a second visit that the Rebalancing Trades took on any import for ACA.  And even then, it was only because the SEC made specific requests for additional information concerning the Rebalancing Trades that ACA began to assess the AMI transactions—too little, too late.

58.     ACA's failures at this critical juncture, when the SEC came onto the scene, were boundless.  ACA failed to grasp the seriousness of the issues facing Chatham—issues ACA created.  Oblivious to these risks, ACA stumbled through the Examination to Chatham's detriment.

59.      To better understand the SEC's concerns, Chatham worked with ACA to run the Rebalancing Trades through ACA's proprietary trading software to simulate an SEC examination. Despite the scrutiny these trades were now subject to by the SEC Examination Staff, ACA reaffirmed its prior grossly negligent advice that Chatham could engage in the Rebalancing Trades by trading with the market using brokers to conduct the trades.  This advice still contradicted a steady drumbeat of SEC enforcement actions, citing SEC precedent.  Here again, ACA neither raised any red flags nor suggested that the transactions ran counter to the Investment Advisers Act, the Investment Company Act, SEC precedents, or any other laws or regulations.

60.      When the SEC Examination Staff returned for its second visit on October 23 – 24, 2018, the Staff was laser focused on the Rebalancing Trades.  And despite the SEC's having previewed that the Rebalancing Trades would be the focus of this second visit, ACA had woefully underprepared Chatham for this return visit, and, once again, ACA sat by silently.

61.      ACA utterly failed to flag any issues with the Rebalancing Trades—including after Chatham initially raised the question and after the SEC itself raised the issue—and to help Chatham adequately prepare to respond to the SEC's inquiries during the second examination.

62.      When the events of the SEC Examination Staff's visits were leaked to the public in early 2019, Chatham suffered significant consequences at the time, causing several investors to redeem and/or refrain from investing.  Once again, ACA came up short, this time in managing Chatham's response to the leaks.

63.      Following the SEC Examination, Chatham received a deficiency letter from the SEC Examination Staff on May 3, 2019, setting forth deficiencies with respect to Chatham's Rebalancing Trades, which the Examination Staff deemed were cross trades that failed to comply with relevant SEC rules.

64.     In its response to the deficiency letter dated July 3, 2019, Chatham's counsel explained that, on the advice of its compliance adviser (ACA), it "came to the understanding that it could accomplish portfolio rebalancing without engaging in cross trades by trading instead with independent dealers at market prices where the dealers took ownership of, and therefore risk on, the bonds."

65.     Chatham's counsel also explained in its written response that none of ACA's annual compliance reviews "indicated any of the compliance issues identified by the Staff concerning trading in AMI bonds or any other securities.  Thus, compliance guidance and subsequent experience validated Chatham's belief that the trading on which the Staff is now focused was a permissible way to navigate the portfolio management challenges in situations where it was impracticable to meet the regulatory prerequisites for direct cross trades between the Funds' custodial accounts."

66.     Subsequently, in 2019, the SEC enforcement division initiated an investigation into Chatham.

67.     At the conclusion of the SEC's investigation, Chatham and the SEC arrived at a settlement on April 3, 2023, without Chatham's admitting or denying the SEC's findings.  The SEC Order specifically refers to ACA's advice.  And, as part of the settlement as reflected in the SEC Order, Chatham agreed to, inter alia: (1) cease and desist from violating Section 206(2) of the Investment Advisers Act and Section 17(a) of the Investment Company Act; (2) pay disgorgement of $11 million, pre-judgment interest of $3.375 million, and penalty of $4.4 million.

68.     The impact of the SEC's action against Chatham, based on the grossly negligent and irresponsible advice provided by ACA, has been substantial and has injured Chatham both monetarily and reputationally.

69.     Chatham brought this action after the SEC issued its findings in the SEC Order issued on April 3, 2023.  Since the SEC Order was made public, the harm caused by ACA's gross negligence has continued.

### COUNT ONE – BREACH OF CONTRACT I
#### (NON-PRIVILEGED AGREEMENT)

70.     Chatham repeats and realleges the above allegations as if fully set forth herein.

71.     The 2010 Non-Privileged Agreement was a valid and binding agreement during the Relevant Period entered into by ACA and Chatham.

72.     Chatham performed all of its duties and obligations under the 2010 Non-Privileged Agreement.  ACA materially breached the 2010 Non-Privileged Agreement by, among other things, failing to provide Chatham with accurate compliance advice, by failing to conduct the required compliance reviews in accordance with the applicable regulatory requirements, by failing to provide support during Chatham's SEC Examination, and by failing to provide Chatham with accurate advice regarding its policies and procedures, and related review thereof.

73.     As a direct and proximate result of ACA's grossly-negligent failure to perform its obligations under the 2010 Non-Privileged Agreement, Chatham has suffered substantial injuries and damages.

### COUNT TWO – BREACH OF CONTRACT II
#### (PRIVILEGED AGREEMENT)

74.     Chatham repeats and realleges the above allegations as if fully set forth herein.

75.     The 2010 Privileged Agreement and the 2013 Privileged Amendment thereto were valid and binding agreements during the Relevant Period entered into by ACA and S&K.

76.     Chatham is a third-party beneficiary of the 2010 Privileged Agreement and the 2013 Privileged Amendment.  Chatham performed all of its duties and obligations under the 2010 Privileged Agreement and the 2013 Privileged Amendment.

77.     ACA materially breached the 2010 Privileged Agreement and 2013 Privileged Amendment by, among other things, failing to provide Chatham with accurate compliance advice, failing to conduct the required compliance reviews in accordance with the applicable regulatory requirements, failing to provide support during Chatham's SEC Examination, and failing to provide Chatham with accurate advice regarding its policies and procedures, and related review thereof.

78.     As a direct and proximate result of ACA's grossly negligent failure to perform its obligations under the 2010 Privileged Agreement and 2013 Privileged Amendment, Chatham has suffered substantial damages.

## COUNT THREE—GROSS NEGLIGENCE

79.     Chatham repeats and realleges the above allegations as if fully set forth herein.

80.     ACA owed Chatham a duty of reasonable care in connection with the services and advice ACA provided to Chatham under the agreements between both parties, and applicable law, which it violated.

81.     Chatham relied on ACA to provide accurate, complete, and proactive compliance advice in accordance with industry standards and all applicable laws, rules, and regulations, as the leading governance, risk, and compliance advisor in the financial services industry.

82.     ACA knew that Chatham was relying on it for the "expert" compliance advice it had advertised and promised.

83.     Nonetheless, ACA violated its duty of reasonable care to Chatham by providing inaccurate advice on the Rebalancing Trades and by failing to identify the Rebalancing Trades as potential cross trades in at least two separate annual compliance reviews.

84.     ACA's violation of its duty to Chatham represented a gross departure from the standard of reasonable care that ACA owed to Chatham.

85.    The duty owed by ACA was to exercise the level of care and attention expected from a firm of similar reputation and experience when:

   a.    Evaluating and advising Chatham on the adequacy and effectiveness of its controls environment and compliance program;

   b.    Assisting Chatham in connection with a SEC Examination in 2018; and

   c.    Updating Chatham's Compliance Manual to address specific regulatory requirements under the Investment Company Act, Investment Advisers Act, and SEC regulations.

86.    ACA breached its duty and failed to exercise reasonable care by, among other things:

   a.    Providing grossly negligent advice to Chatham, on multiple occasions, regarding how to execute the Rebalancing Trades through a broker or brokers, which was contrary to well-established SEC rules and precedent;

   b.    Providing grossly negligent compliance oversight with regard to Chatham's Rebalancing Trades, including, but not limited to, failing to detect any compliance issues relating to the Rebalancing Trades during its annual reviews in 2016 and 2017;

   c.    Acting in a grossly negligent manner by failing to familiarize itself with Chatham's business to sufficiently perform its duties under the Non-Privileged Agreement.

   d.    Failing to assure that Chatham's compliance policies and procedures were adequate and effective, when in fact the SEC Examination Staff found Chatham's compliance program was not adequately designed to detect cross trades and ensure that cross trades are executed in a manner compliant with the Investment Company Act.

   e.    Failing to provide support before and during the SEC Examination process in 2018.

   f.    Failing to accurately update Chatham's Compliance Manual with the specific regulatory requirements of the Investment Company Act, Investment Advisers Act, and SEC regulations.

87.    In the aggregate, ACA's conduct demonstrated a reckless disregard for the rights of Chatham and a stark departure from the standard of care under which ACA was required to

render its services.  ACA had several opportunities to detect these failings and to correct the erroneous advice it provided to Chatham.  It failed abjectly to do so, and this constitutes gross negligence.

88.    ACA's conduct was grossly negligent and reflects an extreme departure from the required standard of care when providing its promised services, creating an unreasonable risk of harm to Chatham.

89.    As a direct, proximate, and substantial result of ACA's gross negligence, the SEC brought an action against Plaintiff, and Plaintiff has consequently suffered substantial injuries and damages.

## COUNT FOUR—NEGLIGENT MISREPRESENTATION

90.    Chatham repeats and realleges the above allegations as if fully set forth herein.

91.    By reason of the conduct described herein, ACA made incorrect statements, misrepresentations, and/or concealed or failed to disclose material facts about, among other things, Chatham's compliance with SEC rules and regulations and the Rebalancing Trades.  These incorrect, false and/or misleading statements were made directly to Chatham orally and in writing. ACA was aware that its advice, including in connection with the Rebalancing Trades and the mock SEC examinations/audits, as well as the actual SEC Examination, would be and actually was reviewed and relied up by Chatham in the course of Chatham's business.

92.    In making each of these incorrect, false and/or misleading statements, ACA failed to act with the prudence required of a reasonable person in ACA's position, and ACA was otherwise careless and/or reckless in making material statements of fact (or omitting material facts) regarding the Rebalancing Trades and the steps Chatham would have to take to comply with SEC rules and regulations.

93.     At all relevant times, ACA owed to Chatham a duty of care, and the law imposed upon ACA the duty to avoid negligently providing false information.  ACA is a compliance advisor who, in the course of its business, supplies advice and guidance to investment managers, and therefore has specialized knowledge in the field in which it supplies such advice and guidance. ACA actually did, in the course of its business and pecuniary relationship with Chatham, supply such advice and guidance, including in connection with the SEC Examinations and audits and in connection with Chatham's decision to carry out the Rebalancing Trades and structure them in the manner Chatham did.   Moreover, ACA and Chatham were in privity by virtue of the Non-Privileged and Privileged Agreements.  Chatham also reposed in ACA its trust and confidence, and ACA was in a position of superiority in relation to Chatham, by virtue of, among other things, ACA's self-styled expertise.

94.     ACA breached this duty by virtue of the incorrect statements, misrepresentations, and/or concealed material facts outlined herein.

95.     Chatham actually relied on ACA's incorrect statements, misstatements and/or omissions of material fact, and that reliance was reasonable and justifiable.  ACA was a compliance advisor who held itself out as an expert.  Chatham had relied on ACA's advisor and compliance guidance since 2010 and had no reason to believe ACA would furnish incorrect or misrepresented information, or omit material facts.

96.     Furthermore, to the extent that ACA failed to disclose material facts to Chatham, it is not required to plead or prove the element of reliance, because reliance on an omission is presumed.

97.     Chatham suffered by reason, and as a direct and proximate cause, of ACA's negligent misrepresentations.

## COUNT 5—BREACH OF FIDUCIARY DUTY

98.     Chatham repeats and realleges the above allegations as if fully set forth herein.

99.     Notwithstanding any contractual disclaimers, at all times ACA held itself out as an expert in compliance, was acting in a fiduciary capacity, and owed duties of loyalty, care, and good faith to Chatham under applicable law, which it violated.

100.    Chatham relied on ACA's purported expertise to provide accurate, complete, and proactive compliance advice in accordance with industry standards and all applicable laws, rules and regulations, as the leading governance, risk, and compliance advisor in the financial services industry.

101.    ACA breached these duties by, among other things,

g.      Providing grossly negligent advice to Chatham, on multiple occasions, regarding how to execute the Rebalancing Trades through a broker or brokers, which was contrary to well-established SEC rules and precedent;

h.      Providing grossly negligent compliance oversight with regard to Chatham's Rebalancing Trades, including, but not limited to, failing to detect any compliance issues relating to the Rebalancing Trades during its annual reviews in 2016 and 2017;

i.      Acting in a grossly negligent manner by failing to familiarize itself with Chatham's business to sufficiently perform its duties under the Non-Privileged Agreement.

j.      Failing to assure that Chatham's compliance policies and procedures were adequate and effective, when in fact the SEC Examination Staff found Chatham's compliance program was not adequately designed to detect cross trades and ensure that cross trades are executed in a manner compliant with the Investment Company Act.

k.      Failing to provide support before and during the SEC Examination process in 2018.

l.      Failing to accurately update Chatham's Compliance Manual with specific regulatory requirements of the Investment Company Act, Investment Advisers Act, and SEC regulations.

102.    In breaching the aforementioned duties, ACA caused substantial harm to Chatham. But for those breaches, Chatham would not have suffered damage.

**WHEREFORE,** Plaintiff Chatham respectfully requests that this Court enter a judgment:

(i)    Awarding damages to Chatham in an amount to be proven at trial, but in no event less than $100 million dollars, including, without limitation $75 million in advisory fees; additional amounts Chatham must now pay to resolve an SEC Enforcement matter, e.g., $11 million in disgorgement, $3.375 million in prejudgment interest; and amounts reflecting the reputational harm ACA caused Chatham in an amount to be proven at trial; and

(ii)    Granting such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury on all issues set forth in the Complaint.

Dated: April 17, 2023

Attorneys for Plaintiff Chatham Asset Management, LLC

By:  _/s/ Marc B. Kramer_
Marc B. Kramer
    Attorney ID No. 016241987
Michael Hampson
    Attorney ID No. 030812006
Brandon Fierro
    Attorney ID No. 909052012
**ROLNICK KRAMER SADIGHI LLP**
300 Executive Drive, Suite 275
West Orange, NJ 07052

   -and-

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
John B. Quinn
C. Dabney O'Riordan

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

James C. Tecce
51 Madison Avenue
New York, New York 10010

Stacylyn Doore
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199

## CERTIFICATIONS IN ACCORDANCE WITH R. 4:5-1

 I hereby certify to the best of my knowledge and belief pursuant to <u>R.</u> 4:5-1(b)(2) that there are no other civil proceedings either pending or contemplated with respect to the matter in controversy herein and no other parties who should be joined in the action.

Dated:  April 17, 2023


By: <u> /s/ Marc B. Kramer</u>
   Marc B. Kramer, Esq.
   ROLNICK KRAMER SADIGHI LLP
   *Attorneys for Plaintiff*
   *Chatham Asset Management, LLC*


 Pursuant to <u>R.</u> 4:5-1(b)(3), I hereby certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with <u>R.</u> 1:38-7(b).

Dated:  April 17, 2023


By: <u> /s/ Marc B. Kramer</u>
   Marc B. Kramer, Esq.
   ROLNICK KRAMER SADIGHI LLP
   *Attorneys for Plaintiff*
   *Chatham Asset Management, LLC*

# EXHIBIT A



# CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is made and entered into effective as of November 1, 2010 (the "Effective Date"), by and between Adviser Compliance Associates, LLC doing business as ACA Compliance Group ("ACA"), a limited liability company with a place of business at 2120 L Street, NW, Suite 530, Washington, DC 20037, and Chatham Asset Management, LLC ("Client"), a limited liability company located at 26 Main Street, Suite 204, Chatham, NJ 07928.

## 1.    Scope of Engagement

As of the Effective Date, Client is not registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC"). Client has represented to ACA that Client intends to develop a compliance and control environment similar to that which would be present in the operations of an SEC-registered investment adviser that is subject to the Investment Advisers Act of 1940 and SEC rules promulgated thereunder. Therefore, under the terms and conditions set forth below, Client hereby retains ACA to provide certain compliance consulting services as set forth in this Section 1 (the "Services"), and ACA agrees to render such Services.

Client has chosen to implement ACA's $C^3$ Solution™, which consists of the following:

**On-Going Compliance Support**

1. <u>Access to ACA's Library of Compliance Documents</u> – Client will have access to ACA's library of compliance documents, forms, and templates.
2. <u>Unlimited Customized Telephone Consulting</u> – Client will be entitled to call ACA's compliance professionals on an unlimited basis to answer compliance or operational inquiries.
3. <u>SEC Filing Support</u> – ACA will assist Client with filing Form 13F and Schedule 13G, if/when applicable.

**Form ADV Preparation, Filing and Support**

4. <u>Form ADV Preparation and Filing</u> – ACA will prepare and file Client's investment adviser registration filing (Form ADV), including Part 1A and Part 2A and 2B, with the SEC.  ACA will assist Client with:
   a.  Preparing and filing the Entitlement Forms with FINRA (if necessary);

    b. Preparing and filing Part 1A (and Part 1B if applicable) of Form ADV on the IARD, including applicable schedules;

    c. Preparing Part 2A of Form ADV (disclosure brochure);

    d. Registering up to five (5) investment adviser representatives ("IARs") who will conduct business on behalf of Client; and

    e. Preparing up to five (5) Part 2B brochure supplements.

5. <u>Ongoing Form ADV Review</u> – ACA will review and update Form ADV upon request or as necessary, to be determined by Client and/or ACA, and provide recommended corrective actions (if any).

6. <u>IARD Administration</u> – ACA will assist Client with preparing Client's Investment Adviser Registration Depository ("IARD") filings with the appropriate federal and state regulators.

**Compliance Education and Training**

7. <u>Annual Employee Compliance Training</u> – ACA will conduct an annual one-hour training session for employees regarding Client's compliance manual as well as current regulatory issues and focus areas.

8. <u>Subscription to *ACA Insight*</u> (weekly compliance newsletter).

9. <u>Access to ACA Compliance Conference</u> – Up to two of Client's legal and/or compliance personnel will receive access to one of ACA's compliance conferences during the contract year.

10. <u>Access to ACA Compliance Webcasts</u> – Client's employees will receive access to live and archived ACA compliance webcasts during the contract year.

11. <u>Periodic E-mail Compliance Alerts</u> – ACA will provide updates of certain relevant SEC proposed and final rulemakings, and other regulatory actions, as may be relevant to Client's business as an investment adviser.

**2.      Role of ACA**

In providing the Services, ACA may, in its professional judgment, place relatively greater focus on specific topical areas and/or specific reviews or procedures based on Client's unique business operations, investment strategies, product offerings, or risks, current SEC and other regulatory focus areas, and/or Client's subsequent instruction or request. ACA does not agree to provide any services that are not expressly set forth in this Agreement. ACA shall not be required at any time to render Services that would conflict with obligations of ACA undertaken prior to the request for the Services by Client.

ACA does not guarantee that the Services will be favorably received by the SEC or any other regulatory agency. The Services are designed to help provide reasonable, but not absolute, assurance to Client that Client has, or will have, an adequate and effective compliance program with respect to the areas that are covered by the Services. Because the Services are designed to help provide reasonable, but not absolute, assurance and because ACA will not perform a detailed inspection of all of Client's books and records and transactions, there is a risk that material issues or deficiencies, fraudulent activity, misappropriation of assets, or violations of law, which may exist, will not be detected during the course of this engagement.

In addition, and due to the characteristics of fraud, a properly planned and performed engagement may not detect fraudulent activity, misappropriation of assets, or violations of law. ACA will report to Client any fraudulent activity relating to Client that comes to ACA's attention during the course of the engagement. Client acknowledges that it is ultimately responsible for the design, implementation, and maintenance of its compliance program.

ACA does not offer legal or accounting services, nor does it provide substitute services for those provided by legal counsel or certified public accountants. If ACA provides forms or other documents to Client, the provision of such documents should not be deemed to constitute any form of legal advice. Although ACA's work may involve analysis of accounting and financial records, this engagement is not an audit of Client in accordance with generally accepted auditing standards, nor is it a review of the internal controls of Client in accordance with AICPA Statement on Auditing Standards No. 70 or any other authoritative accounting literature.

ACA's performance of the Services may be dependent on Client's timely and effective decisions in response to ACA's inquiries, Client's ability to make data and records available for review by ACA within a reasonable time period following ACA's request for such documentation, and/or the quality or accuracy of the data provided to ACA. The failure of Client to make and communicate requested decisions, to provide reasonably requested data or records in a timely manner, and/or to provide usable data may result in ACA being unable to comment on certain aspects of Client's compliance program, a delay in ACA's production of any written or verbal deliverables, and/or ACA being unable to adequately perform all or some of the Services or otherwise complete the engagement. If ACA is unable to perform all or some of the Services or complete the engagement due to Client's failure to make and communicate decisions, to timely provide reasonably requested data or records, and/or to provide usable data, Client shall nonetheless remain obligated to compensate ACA pursuant to the terms set forth in Section 3 herein.

In the event that Client undergoes an organizational change, whether by acquisition, merger, or any other action, that results in the formation of a separate division, subsidiary, or otherwise affiliated entity, ACA shall not be required to provide the Services to such entity unless specifically covered in the terms of this Agreement. If Client wishes that additional services be provided to the entity, ACA shall be compensated under mutually agreed upon terms pursuant to a separate written agreement.

The Services in no event include ACA acting as an expert witness on Client's behalf or otherwise providing litigation support services, unless specifically stated in Section 1 of this Agreement. In the event that ACA is requested, pursuant to subpoena or order issued pursuant to a valid legal process, to provide testimony or produce documents relating to the Services in judicial or administrative proceedings to which ACA is not a party, ACA shall, unless expressly prohibited by law, notify Client of the request within a reasonable period of time under the circumstances. ACA shall be reimbursed by Client at ACA's then-standard billing rates for ACA's professional time and expenses, including reasonable attorneys' fees, incurred in responding to such request. Client shall be permitted all reasonable opportunities under the circumstances to protect its privileges and interests at its own cost and expense, and ACA shall

3

take all steps reasonably necessary or appropriate under the circumstances to permit Client to assert all applicable rights and privileges with regard to the requested materials in the appropriate forums, and shall cooperate with Client in a commercially reasonable manner in any proceeding relating to the disclosure sought.

All Services shall be performed by (a) employees of ACA and/or its Affiliates (as defined below), and/or (b) independent subcontractors engaged by ACA or its Affiliates with the prior written consent of the Client. ACA reserves the right to determine which individuals shall be assigned to perform Services, and to replace or reassign such individuals during the term of this Agreement. For purposes of this Agreement, "Affiliate" means (a) any Person that is under the Control of ACA, (b) any Person that Controls ACA, or (c) any Person that is under common Control with ACA. "Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint-stock company, trust, unincorporated organization, or other organization, whether or not a legal entity. "Control" means the possession of, directly or indirectly, or the power to direct or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities or general  partner or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings.

In connection with this Agreement, each party shall act as an independent contractor to the other, not as an agent, and as such neither party shall have any authority to bind or commit the other or to make any representation as agent of the other. Nothing herein shall be deemed or construed to create a joint venture, partnership, or employment, agency, or fiduciary relationship between the parties hereto for any purpose, nor to authorize either party to create any obligation, express or implied, on behalf of the other.

**3.     Compensation**

In consideration for ACA's provision of the Services, Client agrees to pay ACA an annual fee of forty thousand dollars ($40,000). ACA shall invoice Client quarterly in advance for Services to be rendered.

All invoices submitted to Client shall include the amount due and a brief description of the Services rendered. All invoices shall be payable to ACA upon receipt. At ACA's option, any invoice remaining unpaid for more than thirty (30) days from the date of such invoice shall accrue interest at a rate of the lesser of one and one-half (1½) percent per month or the maximum rate allowable under applicable law.

ACA shall be reimbursed by Client for all reasonable travel and meal expenses incurred by ACA in connection with the Services. An invoice containing the actual travel and meal expenses shall be submitted to Client as incurred, and shall be payable upon receipt.

4

## 4.   Confidentiality

Each party hereto shall treat as confidential all information disclosed to that party by the other party pursuant to this Agreement orally or that is in written, graphic, machine readable or other tangible form ("Confidential Information") of the other party, shall not use such Confidential Information except as set forth herein, and shall not disclose such Confidential Information to any third party.

Confidential Information shall not include any of the following: (a) information that has come within the public domain through no fault of or action by the receiving party; (b) information that is rightfully available to the receiving party prior to its disclosure hereunder to the receiving party; or (c) information that becomes rightfully available from any third party that is not known to have an obligation to keep such information confidential.

Each party shall limit access to Confidential Information to such party's directors, officers, employees, contractors, attorneys, auditors and regulators, and shall only disclose Confidential Information to such persons pursuant to confidentiality agreements or, in the case of the party's attorneys, auditors, and regulators, professional or legal obligations, at least as protective of such Confidential Information as the Agreement.  Each party shall promptly notify the other party of any actual or suspected misuse or unauthorized disclosure of the other party's Confidential Information.

In the event that ACA or any of its representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand, regulatory proceeding or other similar process) to disclose any of the Confidential Information, ACA shall, unless prohibited by law, provide the Client with prompt written notice (to the extent reasonably practicable) of any such request or requirement so that the Client may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.  If, in the absence of a protective order or other remedy or the receipt of a waiver by the Client, ACA or any of its representatives are nonetheless, upon the advice of its legal counsel, legally compelled to disclose Confidential Information to any tribunal or regulatory authority with relevant jurisdiction or else stand liable for contempt or suffer other censure or penalty, ACA or its representative may, without liability hereunder, disclose to such tribunal or regulatory authority only that portion of the Confidential Information which such counsel advises it is legally required to be disclosed, provided that it exercises reasonable best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with the Client to obtain an appropriate protective order or other reliable assurance that such tribunal will accord the Confidential Information confidential treatment.

Client acknowledges that information obtained by Client about ACA's processes, procedures, methodologies, and techniques for providing the Services or for producing any oral or written deliverables under this Agreement, and any forms or templates provided to Client by ACA, may be valuable and proprietary business information of ACA and may constitute trade secrets of ACA and/or third parties protected by applicable law.

5

Anything in this Agreement to the contrary notwithstanding, each party shall comply with all privacy and data protection laws and regulations that are or that may in the future be applicable to the terms of this Agreement. Without limiting the generality of the preceding sentence, each party agrees that it shall not use or disclose to any third party any nonpublic personal information that it receives from a financial institution in connection with this Agreement, except in accordance with this Agreement. For purposes of this Section 4, the terms "nonpublic personal information" and "financial institution" have the meanings set forth in Section 509 of the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6809) (the "Act"). ACA represents that it is a nonaffiliated third party that is excepted from the Notice and Opt Out Requirements pursuant to the Act.

## 5.    Indemnification and Limitation of Liability

Client shall defend and indemnify ACA and its members, officers, directors, employees, representatives, Client-approved subcontractors, and agents, and its Affiliates and their members, officers, directors, employees, representatives, Client-approved subcontractors, and agents (together with ACA, collectively, the "ACA Parties") from and against any damage, loss, costs, liability, or expense (including reasonable attorneys' fees) based upon any third-party claim arising out of Client's use of the Services or ACA's performance of the Services except to the extent that the claim resulted from the gross negligence, willful misconduct or fraudulent behavior of ACA.

In connection with Client's indemnification obligations hereunder, the relevant ACA Party or Parties shall (a) promptly notify Client of such claim, provided that failure to give such notice shall not relieve Client of its obligations hereunder except to the extent it shall have been prejudiced by such failure and (b) have the right to conduct and control, through counsel of their choosing approved by Client and at the expense of Client, the defense, compromise, or settlement of any third-party claim against an ACA Party as to which indemnification may be sought under this Section 5, and in any such case Client shall cooperate in connection therewith, provided that the ACA Party shall not, without the written consent of Client (which written consent shall not be unreasonably withheld), pay, compromise or settle any such claim.

As a matter of risk management, ACA and Client agree that it is reasonable and necessary to limit the extent to which the ACA Parties shall bear liability under certain circumstances. Accordingly, the ACA Parties shall not be liable to Client for any and all claims relating to this Agreement or the Services provided by ACA hereunder, whether a claim be in tort, contract, or any other theory of law, and whether by statute or otherwise, and including claims alleging consequential, incidental, indirect, punitive loss, or lost profit or similar damages and related costs and expenses (including attorneys' fees), except to the extent that such claim arises pursuant to the ACA Parties' gross negligence, willful misconduct or fraudulent behavior.

Client acknowledges and agrees that it retains sole responsibility and obligation for the accuracy and completeness of the records and data submitted by Client to ACA in connection with ACA's performance of the Services. Accordingly, Client agrees that ACA shall not have, and ACA hereby disclaims, any responsibility for any damages, losses, costs, fees or expenses,

6

whether arising from tort, contract, or any other theory of law, resulting from any inaccuracy in the records and data provided by Client or on Client's behalf by any third party.

The parties agree that the indemnification obligations and the allocations of liability in this Section 5 represent the agreed and bargained-for understanding of the parties.

## 6.   Non-Solicitation

For the period beginning on the date of this Agreement and ending two years after the expiration or termination of this Agreement, Client shall not, unless expressly authorized by ACA in writing in advance, directly or indirectly solicit, offer work to, employ, or contract with, any person who, at any point during the term of this Agreement, was an employee or independent contractor of ACA or of one of ACA's Affiliates who provided Services hereunder, nor shall Client directly or indirectly encourage any such person to terminate their employment or other affiliation with ACA or its Affiliates; provided that the foregoing provision will not prevent Client from employing an ACA (or an ACA Affiliate) employee who responds to any general solicitation of employment not specifically directed towards such employee.

For the period beginning on the date of this Agreement and ending two years after the expiration or termination of this Agreement, ACA shall not, unless expressly authorized by Client in writing in advance, directly or indirectly solicit, offer work to, employ, or contract with, any person who, at any point during the term of this Agreement, was an employee or independent contractor of Client or of one of Client's Affiliates, nor shall ACA directly or indirectly encourage any such person to terminate their employment or other affiliation with Client or its Affiliates.

ACA and Client agree that it would be impossible or inadequate to measure and calculate ACA's or Client's damages from any breach of this Section 6. Accordingly, ACA and Client each agrees that if it breaches this Section 6, ACA or the Client, as applicable, shall have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach. No bond or other security shall be required in obtaining such equitable relief, and ACA and Client hereby consent to the issuance of such injunction and to the ordering of specific performance.

## 7.   Termination

The term of this Agreement shall commence on the Effective Date of this Agreement and shall continue in full force and effect until the earlier of the completion of the engagement or the termination of the Agreement in accordance with the provisions of this Section 7; provided, however, that if Section 3 hereof sets forth an annual fee, the Agreement shall have an initial term of one year commencing on the Effective Date of this Agreement and shall thereafter renew for additional one year terms until the termination of the Agreement in accordance with the provisions of this Section 7.

This Agreement may be terminated (a) at any time upon thirty (30) days' written notice by either party; (b) immediately by ACA if Client is more than sixty (60) days in arrears on fees invoiced and duly owed or is otherwise in default under its obligations hereunder and such default has not been cured within five (5) business days after receipt of written notice; and (c) immediately by either party if the other party makes a general assignment for the benefit of creditors; a trustee, custodian or receiver is appointed by any court with respect to the other party or any substantial part of such party's assets; an action is taken by or against the other party under any bankruptcy or insolvency laws or laws relating to the relief of debtors, including the United States Bankruptcy Code and such action is not dismissed within sixty (60) days of commencement of the action; or the other party is the subject of a winding-up petition which is not dismissed within five (5) business days, or a resolution is passed for its winding-up.

Upon termination, Client shall pay ACA for all Services performed and all reimbursable expenses incurred by ACA under this Agreement up to the date of termination, pursuant to the terms set forth in Section 3 of this Agreement, provided that if Section 3 hereof sets forth an annual fee and this Agreement is terminated by Client in the initial year of the engagement, upon termination, Client shall immediately pay the lesser of (a) the entire annual fee or (b) hours actually incurred up to termination. Should the sum of such amounts payable upon termination be less than any advance payment received by ACA from Client, ACA shall refund the difference.

The confidentiality provisions of Section 4 and indemnification obligations and liability limitations of Section 5 hereof shall survive any termination of this Agreement indefinitely. Additionally, the non-solicitation provisions of Section 6 hereof shall survive any termination of this Agreement for the period and to the extent necessary to give them due effect.

## 8.    Additional Information

This Agreement sets forth the entire understanding between the parties with respect to the subject matter hereof and supersedes and replaces all prior or contemporaneous communications, representations, proposals, arrangements, warranties, or agreements between the parties, whether oral or written, with respect to the subject matter hereof. No other representations, proposals, arrangements, warranties, or agreements, whether oral or written, shall be deemed to bind the parties hereto with respect to the subject matter hereof. No custom, industry standard, or course of dealing between the parties shall in any way vary or alter the terms and conditions of this Agreement. This Agreement shall be deemed to have been drafted by both parties and, in the event of a dispute, shall not be construed against either party.

ACA shall not be liable for any disruption, failure, or delay in the performance of the Services arising from the acts of God or public enemy, war (declared or undeclared), labor disruptions, government action (foreign or domestic), floods, fires, unusually severe weather, earthquakes, epidemics, and other catastrophes, provided that such disruption, failure, or delay did not arise out of the fault or negligence of ACA. Nothing contained in this paragraph shall limit Client's rights hereunder in any way, except that, in the event of ACA's excusable delay in the

performance of the Services, ACA shall not be liable for Client's incidental or consequential damages resulting from that delay.

This Agreement may not be modified or amended except by the mutual written agreement of the parties, executed by an authorized representative of each party, and acknowledged by Client. No waiver of any provision of this Agreement shall be effective unless it is in writing and executed by the party against which it is sought to be enforced. The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver or forfeiture of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercises thereof or the exercise of any other right.

This Agreement may be executed in counterparts or duplicate originals, both of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement.

If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable, the validity or enforceability of the remainder of this Agreement shall not be affected.

All notices required or permitted under this Agreement must be in writing and shall be deemed given (a) when delivered in person or by same-day messenger service, (b) five (5) days after being deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, or (c) one (1) business day after being sent by overnight courier, charges prepaid; and, with respect to each delivery method, addressed to the addresses above.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to principles of conflicts of law thereof.

Each of the undersigned individuals represents and warrants that he or she is expressly and duly authorized by his or her respective entity to execute this Agreement and to legally bind each such entity as set forth in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

**Adviser Compliance Associates, LLC**

By: _____     Date: _____
Catherine M. Saadeh, General Counsel

**Chatham Asset Management, LLC**

By: _____     Date: _____
James Ruggerio Jr., Chief Financial Officer

10

# EXHIBIT B


### ACA
**COMPLIANCE GROUP**

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is made and entered into effective as of November 1, 2010 (the "Effective Date"), by and between Adviser Compliance Associates, LLC doing business as ACA Compliance Group ("ACA"), a limited liability company with a place of business at 2120 L Street, NW, Suite 530, Washington, DC 20037, and Seward & Kissel, LLP ("Law Firm"), a limited liability partnership located at One Battery Park Plaza, New York, NY 10004.

Under the terms and conditions set forth below, Law Firm hereby retains ACA to provide certain compliance consulting services relating to the Investment Advisers Act of 1940 ("Advisers Act") and rules promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), as set forth in Section 1 (the "Services"), to assist Law Firm in providing legal advice to its client, Chatham Asset Management, LLC ("Client"), a limited liability company located at 26 Main Street, Suite 204, Chatham, NJ 07928. ACA hereby agrees to render the Services.

**1.  Scope of Engagement**

Law Firm has chosen to implement ACA's $C^3$ Solution™ for Client, which consists of the following:

**On-Going Compliance Support**

1.  <u>Annual Compliance Program Review</u> – ACA will conduct an annual review of Client's compliance program, including a review of Client's policies, procedures, and other compliance-related documents, as required by Rule 206(4)-7 under the Advisers Act; provided, however, that in the first year of this engagement, in lieu of conducting an annual compliance program review, ACA shall conduct an initial gap analysis and develop and enhance Client's policies and procedures to address specific regulatory requirements under the Advisers Act and to assist Client in reasonably addressing its unique compliance and operational risks.
2.  <u>Review of Policies, Procedures, and Compliance Documents</u> – ACA will review Client's relevant compliance documents, upon Law Firm's or Client's request.

3. <u>Unlimited Marketing, Advertising, and Sales Literature Reviews</u> – ACA will review current or proposed advertising documents on a timely and on-going basis, upon Law Firm's or Client's request.

4. <u>Customized Compliance Manual</u> – ACA will edit, revise, and suggest enhancements, as necessary, to Client's compliance policies and procedures manual dealing with specific regulatory requirements under the Advisers Act, upon Law Firm's or Client's request.

## SEC Inspection Support

5. <u>SEC Inspection Response Program</u> – In the event that Client is examined by the SEC, ACA will provide a maximum of five (5) business days per contract year of in-person assistance, plus unlimited out-of-office assistance, during such regulatory examinations. Upon Law Firm's or Client's request, ACA will:

    a. Review and assess documents produced by Client in response to SEC request(s);

    b. Assist with the preparation of an initial presentation to be provided to the SEC examination staff that discusses Client's advisory business, as well as key components of its compliance program;

    c. Prepare Client's employees for interviews conducted by the SEC's examination staff; and

    d. Serve as an alternative or key contact person for the SEC examination staff.

6. <u>Deficiency Letter Response Writing</u> - ACA will prepare a timely draft of a written response to any SEC deficiency letter received by Client regarding concerns or issues raised during Client's SEC examination.

7. <u>Off-site Assistance with Informal SEC (and State) Regulatory and Compliance Inquiries</u> – To the extent permitted by law, ACA will be available, on an unlimited off-site basis, to assist Law Firm in providing legal advice to Client with responses to informal regulatory inquiries.

## 2.   Role of ACA

In providing the Services, ACA may, in its professional judgment, place relatively greater focus on specific topical areas and/or specific reviews or procedures based on Client's unique business operations, investment strategies, product offerings, or risks, current SEC and other regulatory focus areas, and/or Law Firm's or Client's subsequent instruction or request. ACA does not agree to provide any services that are not expressly set forth in this Agreement. ACA shall not be required at any time to render Services that would conflict with obligations of ACA undertaken prior to the request for the Services by Law Firm.

ACA does not guarantee that the Services will be favorably received by the SEC or any other regulatory agency. The Services are designed to help provide reasonable, but not absolute, assurance to Law Firm that Client has, or will have, an adequate and effective compliance program with respect to the areas that are covered by the Services. Because the Services are designed to help provide reasonable, but not absolute, assurance and because ACA will not

2

perform a detailed inspection of all of Client's books and records and transactions, there is a risk that material issues or deficiencies, fraudulent activity, misappropriation of assets, or violations of law, which may exist, will not be detected during the course of this engagement. In addition, and due to the characteristics of fraud, a properly planned and performed engagement may not detect fraudulent activity, misappropriation of assets, or violations of law. ACA will report to Law Firm any fraudulent activity relating to Client that comes to ACA's attention during the course of the engagement. Client is ultimately responsible for the design, implementation, and maintenance of its compliance program.

ACA does not offer legal or accounting services, nor does it provide substitute services for those provided by legal counsel or certified public accountants. If ACA provides forms or other documents to Law Firm or Client, the provision of such documents should not be deemed to constitute any form of legal advice. Although ACA's work may involve analysis of accounting and financial records, this engagement is not an audit of Client in accordance with generally accepted auditing standards, nor is it a review of the internal controls of Client in accordance with AICPA Statement on Auditing Standards No. 70 or any other authoritative accounting literature.

ACA's performance of the Services may be dependent on Law Firm's and Client's timely and effective decisions in response to ACA's inquiries, Client's ability to make data and records available for review by ACA within a reasonable time period following ACA's request for such documentation, and/or the quality or accuracy of the data provided to ACA. The failure of Law Firm or Client to make and communicate requested decisions, to provide reasonably requested data or records in a timely manner, and/or to provide usable data may result in ACA being unable to comment on certain aspects of Client's compliance program, a delay in ACA's production of any written or verbal deliverables, and/or ACA being unable to adequately perform all or some of the Services or otherwise complete the engagement. If ACA is unable to perform all or some of the Services or complete the engagement due to Law Firm's or Client's failure to make and communicate decisions, to timely provide reasonably requested data or records, and/or to provide usable data, in each case following written notice by ACA of such deficiency and a sixty (60) day period thereafter to cure, Client shall nonetheless remain obligated to compensate ACA pursuant to the terms set forth in Section 3 herein.

In the event that Client undergoes an organizational change, whether by acquisition, merger, or any other action that results in the formation of a separate division, subsidiary, or otherwise affiliated entity, ACA shall not be required to provide the Services to Law Firm relating to such entity unless specifically covered in the terms of this Agreement. If Law Firm or Client wish that additional services be provided to the entity, ACA shall be compensated under mutually agreed upon terms pursuant to a separate written agreement. Law Firm and Client may not assign any rights or obligations under this Agreement without the prior written consent of ACA. ACA may not assign any rights or obligations under this Agreement without the prior written consent of Law Firm and Client.

The Services in no event include ACA acting as an expert witness on Law Firm's or Client's behalf or otherwise providing litigation support services, unless specifically stated in Section 1 of this Agreement. In the event that ACA is requested, pursuant to subpoena or order issued

3

pursuant to a valid legal process, to provide testimony or produce documents relating to the Services in judicial or administrative proceedings to which ACA is not a party, ACA shall, unless expressly prohibited by law, notify Law Firm and Client of the request within a reasonable period of time under the circumstances. ACA shall be reimbursed by Client at ACA's then-standard billing rates for ACA's professional time and expenses, including reasonable attorneys' fees, incurred in responding to such request. Law Firm and Client shall be permitted all reasonable opportunities under the circumstances to protect their privileges and interests at their own cost and expense, and ACA shall take all steps reasonably necessary or appropriate under the circumstances to permit them to assert all applicable rights and privileges with regard to the requested materials in the appropriate forums, and shall cooperate with them in a commercially reasonable manner in any proceeding relating to the disclosure sought.

All Services shall be performed by (a) employees of ACA and/or its Affiliates (as defined below), and/or (b) independent subcontractors engaged by ACA or its Affiliates with the prior written consent of the Client. ACA reserves the right to determine which individuals shall be assigned to perform Services, and to replace or reassign such individuals during the term of this Agreement. For purposes of this Agreement, "Affiliate" means (a) any Person that is under the Control of ACA, (b) any Person that Controls ACA, or (c) any Person that is under common Control with ACA. "Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint-stock company, trust, unincorporated organization, or other organization, whether or not a legal entity. "Control" means the possession of, directly or indirectly, or the power to direct or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities or general  partner or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings.

In connection with this Agreement, each party shall act as an independent contractor to the other, not as an agent, and as such neither party shall have any authority to bind or commit the other or to make any representation as agent of the other. Nothing herein shall be deemed or construed to create a joint venture, partnership, or employment, agency, or fiduciary relationship between ACA and Law Firm, or between ACA and Client, for any purpose, nor to authorize either ACA and Law Firm, or ACA and Client, to create any obligation, express or implied, on behalf of the other.

3.      **Compensation**

In consideration for ACA's provision of the Services, Client agrees to pay ACA an annual fee of sixty thousand dollars ($60,000). ACA shall invoice Client quarterly in advance for Services to be rendered.

All invoices for ACA's Services to Law Firm shall be submitted to Client and shall include the amount due and a brief description of the Services rendered. All invoices shall be payable by Client to ACA upon receipt. At ACA's option, any invoice remaining unpaid for more than thirty (30) days from the date of such invoice shall accrue interest at a rate of the lesser of one and one-half (1½) percent per month or the maximum rate allowable under applicable law.

4

ACA shall be reimbursed by Client for all reasonable travel and meal expenses incurred by ACA in connection with the Services. An invoice containing the actual travel and meal expenses shall be submitted to Client as incurred, and shall be payable upon receipt.

The parties expressly acknowledge and agree that all liability for payment of such fee and reimbursement of such expenses rests with Client and not with Law Firm. Client is not a party hereto, but has signed below solely for the purpose of acknowledging its obligations hereunder, including its undertaking to pay ACA's fee, to reimburse ACA's expenses as described herein, and to indemnify ACA on the terms hereinafter set forth.

4.      **Confidentiality**

Each of ACA, Client, and Law Firm (each, for purposes of this Section 4, a "Party," but only for purposes of governing the confidentiality of information between ACA and Client and ACA and Law Firm, and in no way intending to govern the confidentiality of information between Client and Law Firm) shall treat as confidential all information disclosed to that Party by the other Party pursuant to this Agreement orally or that is in written, graphic, machine readable or other tangible form ("Confidential Information") of the other Party, shall not use such Confidential Information except as set forth herein, and shall not disclose such Confidential Information to any third party.

Confidential Information shall not include any of the following: (a) information that has come within the public domain through no fault of or action by the receiving Party; (b) information that is rightfully available to the receiving Party prior to its disclosure hereunder to the receiving Party; or (c) information that becomes rightfully available from any third party who is not known to have an obligation to keep such information confidential.

Each Party shall limit access to Confidential Information to such Party's directors, officers, employees, contractors, attorneys, auditors and regulators, and shall only disclose Confidential Information to such persons pursuant to confidentiality agreements or, in the case of the Party's attorneys, auditors, and regulators, professional or legal obligations, at least as protective of such Confidential Information as the Agreement. Each Party shall promptly notify the other Party of any actual or suspected misuse or unauthorized disclosure of the other Party's Confidential Information.

In the event that ACA or any of its representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand, regulatory proceeding or other similar process) to disclose any of the Confidential Information, ACA shall, unless prohibited by law, provide the Law Firm and Client with prompt written notice (to the extent reasonably practicable) of any such request or requirement so that the Law Firm and/or the Client may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Client, ACA or any of its representatives are nonetheless, upon the advice of its legal counsel, legally compelled to disclose Confidential Information to any tribunal or regulatory authority with

relevant jurisdiction or else stand liable for contempt or suffer other censure or penalty, ACA or its representative may, without liability hereunder, disclose to such tribunal or regulatory authority only that portion of the Confidential Information which such counsel advises it is legally required to be disclosed, provided that it exercises reasonable best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with the Client and/or Law Firm to obtain an appropriate protective order or other reliable assurance that such tribunal will accord the Confidential Information confidential treatment.

Client and Law Firm each acknowledge that information obtained by Client and/or Law Firm about ACA's processes, procedures, methodologies, and techniques for providing the Services or for producing any oral or written deliverables under this Agreement, and any forms or templates provided to Client or Law Firm by ACA, may be valuable and proprietary business information of ACA and may constitute trade secrets of ACA and/or third parties protected by applicable law.

Anything in this Agreement to the contrary notwithstanding, each Party shall comply with all privacy and data protection laws and regulations that are or that may in the future be applicable to the terms of this Agreement. Without limiting the generality of the preceding sentence, each Party agrees that it shall not use or disclose to any third party any nonpublic personal information that it receives from a financial institution in connection with this Agreement, except in accordance with this Agreement. For purposes of this Section 4, the terms "nonpublic personal information" and "financial institution" have the meanings set forth in Section 509 of the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6809) (the "Act"). ACA represents that it is a nonaffiliated third party that is excepted from the Notice and Opt Out Requirements pursuant to the Act.

## 5.     Indemnification and Limitation of Liability

Client shall defend and indemnify ACA and its members, officers, directors, employees, representatives, Client-approved subcontractors, and agents, and its Affiliates and their members, officers, directors, employees, representatives, Client-approved subcontractors, and agents (together with ACA, collectively, the "ACA Parties") from and against any damage, loss, costs, liability, or expense (including reasonable attorneys' fees) based upon any third-party claim arising out of Law Firm's or Client's use of the Services or ACA's performance of the Services except to the extent that the claim resulted from the gross negligence, willful misconduct or fraudulent behavior of ACA.

In connection with Client's indemnification obligations hereunder, the relevant ACA Party or Parties shall (a) promptly notify Client of such claim, provided that failure to give such notice shall not relieve Client of its obligations hereunder except to the extent it shall have been prejudiced by such failure and (b) have the right to conduct and control, through counsel of their choosing approved by Client and at the expense of the Client, the defense, compromise, or settlement of any third-party claim against an ACA Party as to which indemnification may be sought under this Section 5, and in any such case Client shall cooperate in connection therewith, provided that the ACA Party shall not, without the written consent of Client (which written consent shall not be unreasonably withheld), pay, compromise or settle any such claim.

6

As a matter of risk management, ACA, Law Firm, and Client agree that it is reasonable and necessary to limit the extent to which the ACA Parties shall bear liability under certain circumstances. Accordingly, the ACA Parties shall not be liable to Law Firm and Client for any and all claims relating to this Agreement or the Services provided by ACA thereunder, whether a claim be in tort, contract, or any other theory of law, and whether by statute or otherwise, and including claims alleging consequential, incidental, indirect, punitive loss, or lost profit or similar damages and related costs and expenses (including attorneys' fees), except to the extent that such claim arises pursuant to the ACA Parties' gross negligence, willful misconduct or fraudulent behavior.

Law Firm and Client acknowledge and agree that Client retains sole responsibility and obligation for the accuracy and completeness of the records and data submitted by Client to ACA in connection with ACA's performance of the Services. Accordingly, Law Firm and Client agree that ACA shall not have, and ACA hereby disclaims, any responsibility for any damages, losses, costs, fees or expenses, whether arising from tort, contract, or any other theory of law, resulting from any inaccuracy in the records and data provided by Client or on Client's behalf by Law Firm or any other third party.

ACA, Law Firm, and Client agree that the indemnification obligations and the allocations of liability in this Section 5 represent the agreed and bargained-for understanding of the parties.

## 6.    Non-Solicitation

For the period beginning on the date of this Agreement and ending two years after the expiration or termination of this Agreement, Client shall not, unless expressly authorized by ACA in writing in advance, directly or indirectly solicit, offer work to, employ, or contract with, any person who, at any point during the term of this Agreement, was an employee or independent contractor of ACA or of one of ACA's Affiliates who provided Services hereunder, nor shall Client directly or indirectly encourage any such person to terminate their employment or other affiliation with ACA or its Affiliates; provided that the foregoing provision will not prevent Client from employing an ACA (or an ACA Affiliate) employee who responds to any general solicitation of employment not specifically directed towards such employee.

For the period beginning on the date of this Agreement and ending two years after the expiration or termination of this Agreement, ACA shall not, unless expressly authorized by Client in writing in advance, directly or indirectly solicit, offer work to, employ, or contract with, any person who, at any point during the term of this Agreement, was an employee or independent contractor of Client or of one of Client's Affiliates, nor shall ACA directly or indirectly encourage any such person to terminate their employment or other affiliation with Client or its Affiliates.

ACA and Client agree that it would be impossible or inadequate to measure and calculate ACA's or Client's damages from any breach of this Section 6. Accordingly, ACA and Client each agrees that if it breaches this Section 6, ACA or the Client, as applicable, shall have

7

available, in addition to any other right or remedy available, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach. No bond or other security shall be required in obtaining such equitable relief, and ACA and Client hereby consent to the issuance of such injunction and to the ordering of specific performance.

## 7. Termination

The term of this Agreement shall commence on the Effective Date of this Agreement and shall continue in full force and effect until the earlier of the completion of the engagement or the termination of the Agreement in accordance with the provisions of this Section 7; provided, however, that if Section 3 hereof sets forth an annual fee, the Agreement shall have an initial term of one year commencing on the Effective Date of this Agreement and shall thereafter renew for additional one year terms until the termination of the Agreement in accordance with the provisions of this Section 7.

This Agreement may be terminated (a) at any time upon thirty (30) days' written notice by either party; (b) immediately by ACA if Client is more than sixty (60) days in arrears on fees invoiced and duly owed or is otherwise in default under its obligations hereunder and such default has not been cured within five (5) business days after Client's receipt of written notice of such default; and (c) immediately by ACA or Law Firm or Client if Client or ACA, respectively, makes a general assignment for the benefit of creditors; a trustee, custodian or receiver is appointed by any court with respect to the other party or any substantial part of such party's assets; an action is taken by or against the other party under any bankruptcy or insolvency laws or laws relating to the relief of debtors, including the United States Bankruptcy Code and such action is not dismissed within sixty (60) days of commencement of the action; or the other party is the subject of a winding-up petition which is not dismissed within five (5) business days, or a resolution is passed for its winding-up.

Upon termination, Client shall pay ACA for all Services performed and all reimbursable expenses incurred by ACA under this Agreement up to the date of termination, pursuant to the terms set forth in Section 3 of this Agreement, provided that if Section 3 hereof sets forth an annual fee and this Agreement is terminated by Law Firm or Client in the initial year of the engagement, upon termination, Client shall immediately pay the lesser of (a) the entire annual fee or (b) hours actually incurred up to termination. Should the sum of such amounts payable upon termination be less than any advance payment received by ACA from Client, ACA shall refund the difference.

The confidentiality provisions of Section 4 and indemnification obligations and liability limitations of Section 5 hereof shall survive any termination of this Agreement indefinitely. Additionally, the non-solicitation provisions of Section 6 hereof shall survive any termination of this Agreement for the period and to the extent necessary to give them due effect.

## 8. Additional Information

This Agreement sets forth the entire understanding between ACA, Law Firm, and Client with respect to the subject matter hereof and supersedes and replaces all prior or contemporaneous

communications, representations, proposals, arrangements, warranties, or agreements between ACA, Law Firm, and Client, whether oral or written, with respect to the subject matter hereof. No other representations, proposals, arrangements, warranties, or agreements, whether oral or written, shall be deemed to bind ACA, Law Firm, and Client with respect to the subject matter hereof. No custom, industry standard, or course of dealing between the parties shall in any way vary or alter the terms and conditions of this Agreement. This Agreement shall be deemed to have been drafted by ACA, Law Firm, and Client and, in the event of a dispute, shall not be construed against ACA, Law Firm, or Client specifically.

ACA shall not be liable for any disruption, failure, or delay in the performance of the Services arising from the acts of God or public enemy, war (declared or undeclared), labor disruptions, government action (foreign or domestic), floods, fires, unusually severe weather, earthquakes, epidemics, and other catastrophes, provided that such disruption, failure, or delay did not arise out of the fault or negligence of ACA. Nothing contained in this paragraph shall limit Law Firm's rights hereunder in any way, except that, in the event of ACA's excusable delay in the performance of the Services, ACA shall not be liable for Law Firm's or Client's incidental or consequential damages resulting from that delay.

This Agreement may not be modified or amended except by the mutual written agreement of the parties, executed by an authorized representative of each party, and acknowledged by Client. No waiver of any provision of this Agreement shall be effective unless it is in writing and executed by the party against which it is sought to be enforced. The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver or forfeiture of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercises thereof or the exercise of any other right.

This Agreement may be executed in counterparts or duplicate originals, each of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement.

If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable, the validity or enforceability of the remainder of this Agreement shall not be affected.

All notices required or permitted under this Agreement must be in writing and shall be deemed given (a) when delivered in person or by same-day messenger service, (b) five (5) days after being deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, or (c) one (1) business day after being sent by overnight courier, charges prepaid; and, with respect to each delivery method, addressed to the addresses above.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to principles of conflicts of law thereof.

Each of the undersigned individuals represents and warrants that he or she is expressly and duly authorized by his or her respective entity to execute this Agreement and to legally bind each such entity as set forth in this Agreement.

9

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

**Adviser Compliance Associates, LLC**


By: _____                    Date: ___11-12-10___
      Catherine M. Saadeh, General Counsel


**Seward & Kissel, LLP**


By: _____                    Date: __11/9/10__
      John Cleary, Partner


**Chatham Asset Management, LLC hereby acknowledges its responsibilities herein, including its undertaking to pay ACA's fee pursuant to Section 3 and to indemnify ACA on the terms set forth in Section 5.**

**Acknowledged by: Chatham Asset Management, LLC**


By: _____                    Date: __11/9/10__
      James Ruggerio Jr., Chief Financial Officer


10

# EXHIBIT C



## AMENDMENT TO CONSULTING AGREEMENT

This Amendment to Consulting Agreement (this "Amendment") is made and entered into effective as of May 30, 2013 (the "Amendment Effective Date"), by and between Adviser Compliance Associates, LLC doing business as ACA Compliance Group ("ACA"), a limited liability company with a place of business at 8403 Colesville Road, Suite 870, Silver Spring, MD 20910, and Seward & Kissel, LLP ("Law Firm"), a limited liability partnership located at One Battery Park Plaza, New York, NY 10004.

WHEREAS, pursuant to that certain Consulting Agreement dated effective as of November 1, 2010 (as may have been previously amended, including as amended by that certain Amendment to Consulting Agreement dated effective as of November 30, 2011 and by that certain Amendment to Consulting Agreement dated effective as of January 28, 2013, and as amended by this Amendment, the "Agreement"), by and between ACA and Law Firm, Law Firm retained ACA to provide certain compliance consulting services relating to the Investment Advisers Act of 1940 and rules promulgated thereunder by the U.S. Securities and Exchange Commission to assist Law Firm in providing legal advice to its client, Chatham Asset Management, LLC ("Client"), a limited liability company located at 26 Main Street, Suite 204, Chatham, NJ 07928;

WHEREAS, ACA and Law Firm have agreed to modify the terms of the Agreement, as more particularly described herein; and

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ACA and Law Firm hereby agree as follows:

### 1.    Amendment of the Agreement

The Agreement is hereby amended by inserting the words "and/or the Investment Company Act ("Company Act")" immediately after the words "("Advisers Act")" in the second paragraph of the Agreement.

The Agreement is hereby further amended by adding the following to the end of Section 1 of the Agreement:

### "Company Act Compliance Manual and Compliance Cornerstone™ Services

In addition to the C³ Solution® Services described above, ACA will prepare and deliver to Law Firm and/or Client a customized draft compliance policies and

procedures manual, which will include policies and procedures that are reasonably designed to address the unique compliance and operational risks of Client as a sub-adviser to a registered investment company (the "Fund"). ACA's Company Act Compliance Manual and Compliance Cornerstone™ Services shall include the following:

- Investment Company Compliance Manual Development – During the initial year of the engagement, ACA will draft and/or revise Client's compliance policies and procedures pertaining to Rule 206(4)-7 under the Advisers Act and Rule 38a-1 under the Company Act ("Investment Company Manual") to address regulatory provisions applicable to Client and the delegation of certain responsibilities pursuant to the Fund's or the Fund's sponsor's own regulatory compliance manual and adopted policies and procedures.

- Annual Compliance Program Review – ACA will conduct a limited-scope annual review of Client's compliance program in accordance with, and as required by, Rule 38a-1 under the Company Act. Each annual review will be supplemental to Client's annual Rule 206(4)-7 compliance program review.

- Compliance Manual Maintenance – On an ongoing basis, ACA will review and provide assistance in revising Client's Investment Company Manual, upon Law Firm's and/or Client's request.

- Unlimited Customized Telephone Consulting – Client will be entitled to call ACA's investment company compliance professionals on an unlimited basis to answer any compliance or operational inquiries regarding the Fund or the Company Act that Client may have.

- Form ADV Maintenance – ACA will review and provide Law Firm and/or Client with suggested revisions to Client's Form ADV with respect to disclosures necessary to reflect the Fund's operations."

The Agreement is hereby further amended by deleting the words "sixty-seven thousand five hundred dollars ($67,500)" in Section 3 of the Agreement and by substituting the words "one hundred two thousand five hundred dollars ($102,500)" in lieu thereof.

## 2.    Additional Information

This Amendment is a modification only of certain of the terms of the Agreement. Except as otherwise amended by this Agreement, the terms and provisions of the Agreement, including the rights and obligations of ACA, Law Firm and Client, remain unmodified and in full force and effect.

This Amendment may be executed in counterparts or duplicate originals, each of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Amendment.

2

Each of the undersigned individuals represents and warrants that he or she is expressly and duly authorized by his or her respective entity to execute this Amendment.

IN WITNESS WHEREOF, the parties have executed this Amendment to be effective as of the Amendment Effective Date.

**Adviser Compliance Associates, LLC**

By: _____   Date: __7/11/13__
Matthew G. Steinhilber, Assistant Counsel

**Seward & Kissel, LLP**

By: _____   Date: _6/17/13_
John Cleary, Partner

**Acknowledged by: Chatham Asset Management, LLC**

By: _____   Date: _6/1v/13_
James Ruggerio Jr., Chief Financial Officer

3

# EXHIBIT D



## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is made and entered into effective as of November 1, 2020 (the "Effective Date"), by and between Adviser Compliance Associates, LLC doing business as ACA Compliance Group ("ACA"), a limited liability company with a place of business at 8401 Colesville Road, Suite 700, Silver Spring, MD 20910, and Seward and Kissel, LLP ("Law Firm"), a limited liability partnership with a place of business at One Battery Park Plaza, New York, NY 10004 with respect to its client, Chatham Asset Management, LLC ("Client"), a limited liability company with a place of business at 26 Main Street, Suite 204, Chatham, NJ 07928. Client is executing a counterpart of this Agreement for the sole purpose of confirming its limited obligations to ACA set forth below.

This Agreement hereby replaces that certain Consulting Agreement dated effective as of November 1, 2010 by and between ACA and Seward & Kissel, LLP and acknowledged by Client (as amended, the "Prior Agreement"), which is hereby terminated. Any monies paid by Client in advance under the Prior Agreement for services thereunder not received prior to termination of the Prior Agreement shall be credited towards the fee payable under this Agreement.

Under the terms and conditions set forth below, Law Firm hereby retains ACA to provide certain compliance consulting services relating to the Investment Advisers Act of 1940 ("Advisers Act") and rules promulgated hereunder by the U.S. Securities and Exchange Commission ("SEC"), as set forth in Section 1 below (the "Services"), to assist Law Firm in providing legal advice to Client. ACA agrees to render such Services.

1.      **Scope of Engagement**

**C³ Solution®**

*Ongoing Compliance Support*

1.  <u>Annual Compliance Program Review</u> – ACA will conduct an annual review of Client's compliance program, in accordance with Rule 206(4)-7 under the Advisers Act, which will include a review of Client's policies and procedures and take into consideration changes to Client's advisory business identified by ACA or that have been communicated by Client and/or Law Firm to ACA as well as changes to the Advisers Act and other relevant federal and state securities laws applicable to Client's advisory business and with which Client is required to comply. ACA may focus its review on one or more compliance topics or areas of focus, as mutually agreed upon by ACA and Client.

2. <u>Review of Policies, Procedures, and Compliance Documents</u> – ACA will review and suggest revisions to Client's compliance documents.

3. <u>Marketing and Advertising Reviews</u> – ACA will review and suggest revisions to Client's current or proposed fundraising materials, advertising documents, limited partner communications, and prospective portfolio company and other third party communications.

4. <u>Compliance Manual Support</u> – ACA will review and suggest revisions to Client's policies and procedures manual dealing with specific regulatory requirements under the Advise

*Inspection Support Services*

5. <u>SEC Examination Response Program</u> – If Client is examined by the SEC with respect to regulatory compliance matters (which, for clarity, does not include cybersecurity examinations), ACA will provide a maximum of two (2) dedicated business days per contract year of assistance, plus additional ad-hoc assistance, during any such examination. Upon Law Firm and/or Client's request, ACA will:
   a. Review and evaluate documents produced by Client in response to SEC requests;
   b. Assist with the preparation of an initial presentation to be provided to the SEC examination staff that discusses Client's advisory business as well as key components of its compliance program;
   c. Assist in the preparation of Client's employees for interviews conducted by the SEC examination staff; and
   d. Assist Client in its communication with the SEC examination staff (for clarity, ACA will assist with tracking and coordinating SEC requests and Client's responses, but will not independently respond to such requests on behalf of Client).

6. <u>Deficiency Letter Response Writing</u> – ACA will provide assistance to Client and its legal counsel in connection with a written response to any deficiency letter received by Client from the SEC examination staff following Client's examination with respect to regulatory compliance matters.

7. <u>Off-site Assistance with Informal Regulatory Inquiries</u> – To the extent permitted by law, ACA will be available to assist Law Firm in providing legal advice to Client with responses to informal regulatory inquiries relating to Client's compliance program.

**2.     Role of ACA**

In performing the Services, ACA may, in its professional judgment, place relatively greater focus on specific topical areas and/or specific reviews or procedures based on Client's unique business operations, investment strategies, product offerings, or risks, current SEC regulatory focus areas, and/or Law Firm's subsequent instruction or request. ACA does not agree to provide any services that are not expressly set forth in this Agreement.

ACA does not guarantee that the Services will be favorably received by the SEC or any other regulatory agency. The Services are designed to help provide reasonable, but not absolute, assurance to Law Firm that Client has, or will have once Law Firm has obtained the benefit of the Services, an understanding of whether Client has an adequate and effective compliance program with respect to the areas that are covered by the Services. Because the Services are designed to help provide reasonable, but not absolute, assurance and because ACA will not perform a detailed inspection of all of Client's books and records, communications, and transactions, there is a risk that material issues or deficiencies, fraudulent activity, misappropriation of assets, or violations of law, which may exist, will not be detected during the course of performing the Services or during the engagement. In addition, and due to the characteristics of fraud, a properly planned and performed engagement may not detect fraudulent activity, misappropriation of assets, or violations of law. ACA will report to Law Firm any fraudulent activity relating to Client that comes to ACA's attention during the course of performing the Services or during the engagement. All parties acknowledge that Client is ultimately responsible for the design, implementation, and maintenance of its compliance program.

ACA does not offer legal or accounting services, nor does it provide substitute services for those provided by Law Firm or certified public accountants. If ACA provides forms or other documents to Law Firm, the provision of such documents should not be deemed to constitute any form of legal advice. This engagement is not an audit of Client in accordance with generally accepted auditing standards, nor is it a review of the internal controls of Client in accordance with any authoritative accounting literature or other accounting standards.

ACA's performance of the Services may be dependent on Law Firm's timely and effective decisions in response to ACA's inquiries, Law Firm's ability to make or cause Client to make data and records available for review by ACA within a reasonable time period following ACA's request for such documentation, and/or the quality or accuracy of the data provided to ACA. The failure of Law Firm to make and communicate requested decisions, to provide requested data or records in a timely manner, and/or to provide usable data may result in ACA being unable to comment on certain aspects of Client's compliance program, a delay in ACA's production of any written or verbal deliverables, and/or ACA being unable to adequately perform all or some of the Services or otherwise complete the engagement. If ACA is unable to perform all or some of the Services or complete the engagement due to Law Firm's failure to make and communicate decisions, to timely provide requested data or records, and/or to provide usable data, Client shall nonetheless remain obligated to compensate ACA pursuant to the terms set forth in Section 3 herein. Law Firm acknowledges that ACA has no obligation under this Agreement or otherwise to determine the lawfulness of Law Firm's or Client's provision of any information to ACA, and that ACA shall not advise Law Firm or Client as to the applicability of any laws or contractual obligations governing Law Firm's or Client's provision thereof.

In the event that Client undergoes an organizational change, whether by acquisition, merger, or any other action, that results in the formation of a separate and distinct division, subsidiary, or otherwise affiliated entity, ACA shall not be required to provide the Services to Law Firm in respect of such separate Client entity unless specifically covered by the terms of this Agreement. If Law Firm wishes that additional services be provided to such entity, ACA shall be compensated under mutually agreed upon terms pursuant to an amendment to this Agreement or a separate

written agreement. Law Firm may not assign any rights under this Agreement without the prior written consent of ACA. Client may not assign any of its express obligations under this Agreement without the prior written consent of ACA.

The Services in no event include ACA acting as an expert witness on Law Firm's or Client's behalf or otherwise providing litigation support services. In the event that ACA is requested, pursuant to subpoena or order issued pursuant to a valid legal process, to provide testimony or produce documents relating to the Services in judicial or administrative proceedings to which ACA is not a party or to which ACA is named as a co-defendant with Law Firm and/or Client in respect of the Services or this Agreement, ACA shall, unless expressly prohibited by law, notify both Client and Law Firm of the request within a reasonable period of time under the circumstances. Unless the dispute is between the parties, ACA shall be reimbursed by Client at ACA's then-standard billing rates for ACA's professional time and expenses incurred in responding to such request. Law Firm shall be permitted all reasonable opportunities under the circumstances to protect Client's privileges and interests at Client's sole cost and expense (except as aforesaid in the case of a dispute between the parties), and ACA shall take all steps reasonably necessary or appropriate under the circumstances to permit Law Firm or other representatives of Client to assert all applicable rights and privileges with regard to the requested materials in the appropriate forums, and shall cooperate with Law Firm and Client in a commercially reasonable manner in any proceeding relating to the disclosure sought.

All Services shall be performed by employees of ACA or and/or its Affiliates (as defined below). ACA reserves the right to determine which individual employees shall be assigned to perform the Services, and to replace or reassign such individuals during the term of this Agreement. ACA will not assign or use independent subcontractors without the prior consent of Law Firm.

For purposes of this Agreement, "Affiliate" with respect to any Person means (a) any Person that is under the Control of such party, (b) any Person that Controls such party, or (c) any Person that is under common Control with such party. "Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint-stock company, trust, unincorporated organization, or other organization, whether or not a legal entity. "Control" means the possession of, directly or indirectly, or the power to direct or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities or general partner or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. For purposes of this Agreement, ACA's ultimate Controlling parent shall be SIH ACA Topco, L.P.

In connection with this Agreement, each party shall act as an independent contractor to the other, not as an agent, and as such neither party shall have any authority to bind or commit the other or to make any representation as agent of the other. Nothing herein shall be deemed or construed to create a joint venture, partnership, or employment, agency, or fiduciary relationship between or among the parties nor to authorize any of Law Firm, ACA or Client to create any obligation, express or implied, on behalf of any of the others.

**3.     Compensation**

In consideration for ACA's provision of the Services set forth in Section A above, Client agrees to pay ACA an annual fee of fifty-five thousand dollars ($55,000). ACA shall invoice Client as follows: (a) upon execution for a prorated portion of the annual fee for the period from the Effective Date through the end of the current calendar quarter, and (b) on a quarterly basis thereafter at the beginning of each calendar quarter in equal quarterly installments.

All invoices for ACA's Services to Law Firm submitted to Client shall include the amount due and a brief description of the Services rendered or to be rendered. All invoices shall be payable to ACA upon receipt. At ACA's option, any invoice remaining unpaid for more than thirty (30) days from the date of such invoice shall accrue interest at a rate of the lesser of one and one-half (1½) percent per month or the maximum rate allowable under applicable law.

Invoices will be sent to the following Client contact name and address (or, if such information is not completed below by Client, to the primary Client contact name and address on file with ACA), unless otherwise instructed by Client:

- Client contact name: James Ruggerio, Jr., Chief Operating Officer
- Email address: jim@chathamasset.com

ACA shall be reimbursed by Client for all reasonable travel and meal expenses incurred by ACA in connection with the Services. An invoice containing the actual travel and meal expenses shall be submitted to Client as incurred, and shall be payable upon receipt.

The parties expressly acknowledge and agree that all liability for payment of such fee and reimbursement of such expenses rests with Client and not with Law Firm.

## 4.      Confidentiality

Each of ACA and Client (each, for purposes of this Section 4, a "Party," but only for purposes of governing the confidentiality of information between ACA and Client and in no way intending to govern the confidentiality of information between Law Firm and Client) shall treat as confidential all information disclosed (i) by ACA to Client or Law Firm or (ii) by Client or Law Firm to ACA pursuant to this Agreement orally or that is in written, graphic, machine readable or other tangible form and is marked "Confidential," "Proprietary," or in some other manner to indicate its confidential nature, or that would reasonably be understood to be confidential or proprietary in nature ("Confidential Information"), shall not use such Confidential Information except as set forth herein, and shall use reasonable efforts not to disclose such Confidential Information to any third party.

Without limiting the foregoing, each of the Parties shall use at least the same degree of care that it uses to prevent the disclosure of its own confidential information, but not less than reasonable care, to prevent the disclosure of Confidential Information disclosed to it by either Party under this Agreement. Law Firm shall comply with its professional obligations in respect of all Confidential Information.

Confidential Information shall not include any of the following: (a) information that has come within the public domain through no fault of or action by the receiving Party; (b) information that is rightfully available to the receiving Party prior to its disclosure hereunder to the receiving Party; (c) information that becomes rightfully available from any third party; or (d) information that was developed by employees or agents of a Party without use of or reference to any Confidential Information communicated by or on behalf of another Party.

Each Party shall limit access to Confidential Information to such Party's directors, officers, employees, partners, Affiliates, consultants, contractors, subcontractors, attorneys, auditors and regulators with a need to know, and shall only disclose Confidential Information to such persons who are not part of their respective organizations subject to the benefit of confidentiality agreements of similar scope hereto or professional or legal obligations. Notwithstanding the foregoing, ACA shall be permitted to disclose Law Firm Confidential Information: (a) at Law Firm's direction, to Client's attorneys (other than Law Firm), accountants and/or professional advisers, and (b) any third party that has been approved by Law Firm via email or other writing. Each Party shall promptly notify the other Party of any actual or suspected misuse of such Party's Confidential Information.

Disclosure of Confidential Information shall also not be precluded if disclosure is in response to a valid subpoena or order issued pursuant to a valid legal process or is otherwise required by law. In the event that ACA receives a subpoena requiring disclosure of Client's Confidential Information, ACA shall, unless prohibited by law, promptly provide written notice thereof so as to permit Law Firm or other representatives of Client the opportunity to protect Client's privileges and interests at Client's sole cost and expense. ACA shall take all steps reasonably necessary or appropriate under the circumstances to permit representatives of Client to assert all applicable rights and privileges with regard to the requested materials in the appropriate forums, and shall cooperate with Law Firm and Client in a commercially reasonable manner in any proceeding relating to the disclosure sought. ACA understands that it is Client's intention and the position of Law Firm that ACA's work for it will be covered by the attorney client privilege, work product doctrine, and other applicable privileges and/or doctrines. Communications between and among Law Firm, Client and ACA are incidental to the rendering of legal services and are intended to be protected by Client's attorney-client privilege, the work product doctrine, and are made for the purpose of assisting in rendering legal advice to Client. ACA will use information disclosed by Law Firm or Client under this Agreement solely for purposes of this engagement. Further, ACA will keep confidential both the results of ACA's work and the fact of this engagement, unless Law Firm indicates otherwise or if required by law or as provided herein. ACA team members' written notes and other work product will be generated only for purposes of this engagement and ACA will maintain as confidential any such written work product and any other documents and information prepared or received by ACA pursuant to this engagement unless Law Firm indicates to the contrary or if required by law or as provided herein.

Client acknowledges that information obtained by Law Firm or Client about ACA's processes, procedures, methodologies, and techniques for providing the Services or for producing any oral or written deliverables under this Agreement, and any forms or templates provided to Law Firm or Client by ACA, may be valuable and proprietary business information of ACA and may constitute trade secrets of ACA and/or third parties protected by applicable law. Law Firm agrees to use ACA's reports, forms, and templates provided hereunder only in connection with Law Firm's

provision of legal advice to Client. In addition, Client, Law Firm, and Client's other attorneys and legal representatives shall be permitted to disclose any deliverables received from ACA in connection with responses to regulatory inquiries, defenses to regulatory enforcement actions, and defenses to other litigation.

Each Party recognizes and agrees that nothing contained in this Agreement shall be construed as granting any property rights, by license or otherwise, to any Confidential Information disclosed pursuant to this Agreement, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information.

Anything in this Agreement to the contrary notwithstanding, each Party shall comply with all privacy and data protection laws and regulations that are or that may in the future be applicable to the performance of the Services. Without limiting the generality of the preceding sentence, each Party agrees that it shall not use or disclose to any third party any nonpublic personal information that it receives from a financial institution in connection with this Agreement, except in accordance with this Agreement. For purposes of this Section 4, the terms "nonpublic personal information" and "financial institution" have the meanings set forth in Section 509 of the Gramm-Leach-Bliley Act (P.L. 106-102) (15 U.S.C. Section 6809) (the "Act"). ACA represents that it is a nonaffiliated third party that is excepted from the Notice and Opt Out Requirements pursuant to the Act.

No Party shall export, directly or indirectly, any technical data acquired from any other Party pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other governmental approval, without first obtaining such license or approval and the prior written consent of the providing Party.

## 5.    Indemnification and Limitation of Liability

Client shall defend and indemnify ACA and its members, officers, directors, employees, representatives, subcontractors, and agents, and its Affiliates and their members, officers, directors, employees, representatives, subcontractors, and agents (together with ACA, collectively, the "ACA Parties") from and against any damage, loss, costs, liability, or expense (including reasonable attorneys' fees) based upon any third-party claim arising out of the Services or ACA's performance of the Services, except to the extent that it is determined pursuant to order of a court of competent jurisdiction that is not subject to a timely-filed appeal that the claim resulted from the willful misconduct, gross negligence, breach of this Agreement or fraudulent behavior of ACA.

In connection with Client 's indemnification obligations hereunder, the relevant ACA Party or Parties shall (a) promptly notify Client and Law Firm of such claim, provided that failure to give such notice shall not relieve Client of its obligations hereunder except to the extent it shall have been prejudiced by such failure and (b) have the right to conduct and control, through counsel of its or their choosing and at the expense of Client, the defense, compromise, or settlement of any third-party claim against an ACA Party as to which indemnification may be sought under this Section 5, and in any such case Client shall cooperate in connection therewith, provided that the

relevant ACA Party or Parties shall not, without the prior written consent of Client (which written consent shall not be unreasonably withheld), pay, compromise or settle any such claim.

The liability of the ACA Parties to Law Firm and Client for any and all claims relating to this Agreement or the Services provided by ACA hereunder, whether a claim be in tort, contract, or any other theory of law, and whether by statute or otherwise, shall not, in the aggregate, exceed the greater of (a) total professional fees paid by Client to ACA under this Agreement and all other agreements between Client, on the one hand and ACA and its Affiliates, on the other and (b) one million dollars ($1,000,000), except to the extent that it is determined pursuant to order of a court of competent jurisdiction that is not subject to a timely-filed appeal that the claim resulted from the willful misconduct, gross negligence, or fraudulent behavior of any of the ACA Parties. In no event shall any party be liable for consequential, incidental, indirect, punitive loss, or lost profit or similar damages and related costs and expenses (including attorneys' fees) even if the party has been advised of their possible existence.

Law Firm and Client each acknowledge and agree that Client retains sole responsibility and obligation for the accuracy and completeness of the records and data submitted by Law Firm or Client to ACA in connection with ACA's performance of the Services. Accordingly, Law Firm and Client each agree that ACA shall not have, and ACA hereby disclaims, any responsibility for any damages, losses, costs, fees or expenses, whether arising from tort, contract, or any other theory of law, to the extent resulting from any inaccuracy in the records and data provided by Law Firm or on Client's behalf by any other third party.

In any litigation or other action between ACA and Client to collect fees provided for in Section 3 of this Agreement, the prevailing party shall be compensated by the non-prevailing party for related attorneys' fees and court costs.

The parties agree that the indemnification obligations and the allocations of liability in this Section 5 represent the agreed and bargained-for understanding of the parties.

## 6.      Non-Solicitation

For the period beginning on the Effective Date and ending two years after the expiration or termination of this Agreement, neither ACA nor Client shall, unless expressly authorized by the other in writing in advance, directly or indirectly solicit, offer work to, employ, or contract with, any person who, at any point during the term of this Agreement, was an employee of the other, nor shall either of them directly or indirectly encourage any such person to terminate their employment with the other; provided, however, that the foregoing limitation on solicitation (but for clarity not the limitation on offering work to, employing, or contracting with) shall not apply to any general solicitation by a party not specifically targeted at employees of the other.

Each of ACA and Client agrees that it would be impossible or inadequate to measure and calculate their damages from any breach of this Section 6. Accordingly, if ACA or Client breaches this Section 6, the non-breaching party shall have available, in addition to any other right or remedy available, the right to seek an injunction from a court of competent jurisdiction restraining such breach or threatened breach. No bond or other security shall be required in obtaining such equitable

relief, and each of ACA and Client hereby consents to the issuance of such injunction and to the ordering of specific performance.

In addition, in the event of a breach of this Section 6, the non-breaching party will be entitled, as liquidated damages and not as a penalty, to the greater of (a) sixty-five thousand dollars ($65,000) or (b) an amount equal to sixty percent (60%) of the total compensation paid by the non-breaching party to such employee for the one-year period preceding such breach.

## 7.     Termination

The term of this Agreement shall commence on the Effective Date and shall continue in full force and effect until the earlier of the completion of the engagement or the termination of this Agreement in accordance with the provisions of this Section 7.

This Agreement may be terminated (a) at any time upon thirty (30) days' written notice by either party; (b) immediately by ACA if Client is more than sixty (60) days in arrears on fees invoiced and duly owed or is otherwise in default under its obligations hereunder and in either case such default has not been cured within five (5) days after receipt of written notice; and (c) immediately by (i) Law Firm, if ACA has, on the one hand or (ii) ACA, if Client has on the other hand made a general assignment for the benefit of creditors; a trustee, custodian or receiver is appointed by any court with respect to the other party or any substantial part of such party's assets; an action is taken by or against the other party under any bankruptcy or insolvency laws or laws relating to the relief of debtors, including the United States Bankruptcy Code and such action is not dismissed within sixty (60) days of commencement of the action; or the other party is the subject of a winding-up petition which is not dismissed within five (5) business days of the filing thereof, or a resolution is passed for its winding-up.

Upon termination, Client shall pay ACA for all Services performed and all expenses incurred by ACA required to be reimbursed under this Agreement up to the date of termination, pursuant to the terms set forth in Section 3 of this Agreement. Should the sum of such amounts payable upon termination be less than any advance payment received by ACA from Client ACA shall refund the difference.

The confidentiality provisions of Section 4 and indemnification obligations and liability limitations of Section 5 hereof shall survive any termination of this Agreement indefinitely. Additionally, the non-solicitation provisions of Section 6 hereof shall survive any termination of this Agreement for the period and to the extent necessary to give them due effect.

## 8.     Additional Information

This Agreement sets forth the entire understanding between ACA and Law Firm (and with respect to those specific obligations of Client, Client) with respect to the subject matter hereof and supersedes and replaces all prior or contemporaneous communications, representations, proposals, arrangements, warranties, or agreements between or among such Persons, whether oral or written, with respect to the subject matter hereof. No other representations, proposals, arrangements, warranties, or agreements, whether oral or written, shall be deemed to bind any Person with respect

to the subject matter hereof. This Agreement is made solely for the benefit of ACA, Law Firm and, to the limited extent set forth herein, Client and their respective permitted successors and assigns, and no other person shall have any right, benefit or interest under or because of this Agreement. This Agreement shall be deemed to have been drafted by ACA and Law Firm and in the event of a dispute, shall not be construed against ACA, Law Firm or Client.

ACA shall not be liable for any disruption, failure, or delay in the performance of the Services arising from the acts of God or public enemy, war (declared or undeclared), labor disruptions, government action (foreign or domestic), floods, fires, unusually severe weather, earthquakes, epidemics, and other catastrophes, provided that such disruption, failure, or delay did not arise out of the fault or negligence of ACA. Nothing contained in this paragraph shall limit Law Firm's rights hereunder in any way, except that, in the event of ACA's excusable delay in the performance of the Services, ACA shall not be liable for any incidental or consequential damages resulting from that delay.

This Agreement may not be modified or amended except by the mutual written agreement of the parties, executed by an authorized representative of each party and, insofar as any modification or amendment is made to a provision expressly acknowledged by Client as its obligation, by Client. No waiver of any provision of this Agreement shall be effective unless it is in writing and executed by the party against which it is sought to be enforced. Notwithstanding the foregoing two sentences, modifications or amendments of the scope of Services as set forth in Section 1 herein, the fee or fee terms as set forth in Section 3 herein, and/or the confidentiality obligations as set forth in Section 4 herein, may be made pursuant to a course of written communications, including email, between authorized representatives of the parties hereto, provided such communications reasonably evidence offer and acceptance of such modified or amended terms. The delay or failure by any party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver or forfeiture of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercises thereof or the exercise of any other right.

This Agreement may be executed in counterparts or duplicate originals, all of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement.

If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable, the validity or enforceability of the remainder of this Agreement shall not be affected.

Headings in this Agreement are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

All notices required or permitted under this Agreement must be in writing and shall be deemed given (a) when delivered in person or by same-day messenger service, (b) five (5) days after being deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, (c) one (1) business day after being sent by overnight courier, charges prepaid, or (d) by confirmed e-mail or facsimile to the signatory or the relevant party's internal counsel and, with respect to each delivery method (a), (b), or (c), addressed to the addresses above.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflicts of law thereof.

Each of the undersigned individuals represents and warrants that he or she is expressly and duly authorized by his or her respective entity to execute this Agreement and to legally bind each such entity as set forth in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

**Adviser Compliance Associates, LLC**

By: _____        Date: _____

**Seward and Kissel, LLP**

By: _____        Date: 5.5.21

**Chatham Asset Management, LLC hereby acknowledge its responsibilities herein, including its undertaking to pay ACA's fee pursuant to Section 3 and to indemnify ACA on the terms set forth in Section 5.**

Acknowledged by: Chatham Asset Management, LLC

By: _____        Date: 4/14/2021
            James Ruggerio, Jr.
            Chief Operating Officer

11

# Civil Case Information Statement

## Case Details: MORRIS | Civil Part Docket# L-000672-23

**Case Caption:** CHATHAM ASSET MANAGE MENT, LLC VS ADVISOR COMPLI

**Case Initiation Date:** 04/17/2023

**Attorney Name:** MARC BRADLEY KRAMER

**Firm Name:** ROLNICK KRAMER SADIGHI LLP

**Address:** 300 EXECUTIVE DR STE 275

WEST ORANGE NJ 07052

**Phone:** 2125972800

**Name of Party:** PLAINTIFF : Chatham Asset Management, LLC

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Chatham Asset Management, LLC?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

04/17/2023
Dated

/s/ MARC BRADLEY KRAMER
Signed

MORRIS COUNTY SUPERIOR COURT
PO BOX 910
MORRISTOWN        NJ 07963

                                    TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (862) 397-5700
COURT HOURS  8:30 AM - 4:30 PM

                        DATE:   APRIL 17, 2023
                        RE:     CHATHAM ASSET MANAGE MENT, LLC  VS ADVISOR COMPLI
                        DOCKET: MRS L -000672 23

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON FRANK DEANGELIS

        IF YOU HAVE ANY QUESTIONS, CONTACT TEAM       001
AT:  (862) 397-5700 EXT 75351.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.
                        ATTENTION:
                                ATT: MARC B. KRAMER
                                ROLNICK KRAMER SADIGHI LLP
                                300 EXECUTIVE DR
                                STE 275
                                WEST ORANGE       NJ 07052


ECOURTS

Michael J. Hampson (Bar No. 030812006)
**ROLNICK KRAMER SADIGHI LLP**
300 Executive Drive, Suite 275
West Orange, NJ 07052
Tel. 212.597.2800

*Counsel for Plaintiff Chatham Asset Management, LLC*

| | |
|---|---|
| CHATHAM ASSET MANAGEMENT, LLC,<br><br>                              Plaintiff,<br><br>         v.<br><br>ADVISER COMPLIANCE ASSOCIATES, LLC<br>D/B/A ACA COMPLIANCE GROUP,<br><br>                              Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MRS-L-000672-23<br>CIVIL ACTION<br><br><br>**NOTICE OF APPEARANCE** |

TO: CLERK OF THE COURT AND ALL PARTIES

PLEASE TAKE NOTICE that the undersigned hereby enters his appearance as counsel of record in the above-captioned matter on behalf of Plaintiff Chatham Asset Management, LLC. The undersigned requests that all notices and all papers served, or required to be served in this case be given to, and served upon, the undersigned at the address listed.

ROLNICK KRAMER SADIGHI LLP
300 Executive Drive, Suite 275
West Orange, NJ 07052

*Counsel for Plaintiff Chatham Asset Management, LLC*

Dated: April 19, 2023                By:   */s/ Michael J. Hampson*
                                        Michael J. Hampson

Brandon Fierro (Bar No. 909052012)
**ROLNICK KRAMER SADIGHI LLP**
300 Executive Drive, Suite 275
West Orange, NJ 07052
Tel. 212.597.2800

*Counsel for Plaintiff Chatham Asset Management, LLC*

| | |
|---|---|
| CHATHAM ASSET MANAGEMENT, LLC,<br><br>         Plaintiff,<br><br>  v.<br><br>ADVISER COMPLIANCE ASSOCIATES, LLC<br>D/B/A ACA COMPLIANCE GROUP,<br><br>         Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MRS-L-000672-23<br>CIVIL ACTION<br><br><br>**NOTICE OF APPEARANCE** |

TO: CLERK OF THE COURT AND ALL PARTIES

  PLEASE TAKE NOTICE that the undersigned hereby enters his appearance as counsel of record in the above-captioned matter on behalf of Plaintiff Chatham Asset Management, LLC. The undersigned requests that all notices and all papers served, or required to be served in this case be given to, and served upon, the undersigned at the address listed.

        ROLNICK KRAMER SADIGHI LLP
        300 Executive Drive, Suite 275
        West Orange, NJ 07052

        *Counsel for Plaintiff Chatham Asset*
        *Management, LLC*

Dated: April 19, 2023    By:___*/s/ Brandon Fierro*_____
           Brandon Fierro

**ROLNICK KRAMER SADIGHI LLP**
Marc B. Kramer
Attorney ID No. 016241987
300 Executive Drive, Suite 275
West Orange, NJ 07052

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
John B. Quinn
C. Dabney O'Riordan
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

James C. Tecce
51 Madison Avenue
New York, New York 10010

Stacylyn Doore
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199

*Attorneys for Plaintiff Chatham Asset Management, LLC*

| | |
|---|---|
| CHATHAM ASSET MANAGEMENT, LLC,<br><br>                              Plaintiff,<br><br>             v.<br><br>ADVISER COMPLIANCE ASSOCIATES, LLC<br>D/B/A ACA COMPLIANCE GROUP,<br><br>                              Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>MORRIS COUNTY<br><br>DOCKET NO. MRS-L-000672-23<br>CIVIL ACTION<br><br>**ACKNOWLEDGMENT OF SERVICE** |

On this 19th day of April, 2023, the undersigned hereby accepts service of the Summons

and the Complaint and Demand for Jury Trial upon Defendant Adviser Compliance Associates,

LLC d/b/a ACA Group f/k/a ACA Compliance Group ("Defendant").  By accepting service as

described herein, Defendant does not intend to waive any defense other than those for failure

and/or insufficiency of process.

1

/s/ Joshua N. Howley
Joshua N. Howley
Attorney ID No. 021722001
SILLS CUMMIS & GROSS P.C.
1037 Raymond Boulevard
One Riverfront Plaza
Newark, New Jersey  07102

*Counsel for Defendant Adviser Compliance Associates, LLC d/b/a ACA Group f/k/a ACA Compliance Group*

Nicole E. Crossey (ID# 304532019)
**TROUTMAN PEPPER HAMILTON**
 **SANDERS LLP**
Suite 400
301 Carnegie Center
Princeton, NJ 08543
(609) 452-0808
*Attorneys for Defendant Adviser Compliance Associates, LLC*
*d/b/a ACA Compliance Group*

| | |
|---|---|
| CHATHAM ASSET MANAGEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ADVISER COMPLIANCE ASSOCIATES, LLC D/B/A ACA COMPLIANCE GROUP,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – MORRIS COUNTY DOCKET NO. MRS-L-672-23<br><br>CIVIL ACTION<br><br>**NOTICE OF APPEARANCE** |

**PLEASE TAKE NOTICE** that Nicole E. Crossey, Esq. of the law firm Troutman

Pepper Hamilton Sanders LLP hereby enters her appearance as counsel for Defendant Adviser

Compliance Associates, LLC d/b/a ACA Compliance Group in the above-captioned matter.

**TROUTMAN PEPPER  HAMILTON**
**SANDERS LLP**
*Attorneys for Adviser Compliance Associates, LLC*
*d/b/a ACA Compliance Group*

By: */s/ Nicole E. Crossey*
       Nicole E. Crossey

Dated:  April 27, 2023

153148200v1