**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CHATHAM ASSET MANAGEMENT, LLC**<br>*Plaintiff*,<br>v.<br>**ADVISER COMPLIANCE ASSOCIATES, LLC D/B/A ACA COMPLIANCE GROUP,**<br>*Defendant.* | **Civil Action No. 23-2677**<br><br>**OPINION** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of the Motion to Dismiss (the "Motion") filed by Defendant Adviser Compliance Associates, LLC ("ACA"). ECF No. 13. Plaintiff Chatham Asset Management, LLC ("Chatham") opposes the Motion. ECF No. 20. For the reasons set forth herein, the Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Chatham is a hedge fund manager organized in Delaware. ECF No. 1.1 ("Compl.") ¶ 9. ACA is a governance, risk, and compliance advisor organized in the District and Columbia. Id. ¶ 10. As an aspiring registered investment advisor, Chatham sought to ensure compliance with the regulations promulgated under the Investment Advisers Act. Id. ¶ 14. Chatham therefore retained ACA, which was founded by former SEC and state regulators to provide expert guidance on regulations, including compliance solutions. Id. ¶ 15.

Two agreements governed the relationship between ACA and Chatham. Id. ¶ 16. First, ACA and Chatham entered into a "non-privileged agreement" that required ACA to provide SEC filing assistance and compliance support, including telephone consulting for trading questions. Id.

¶ 17.  Second, ACA entered into a "privileged agreement" with Chatham's counsel, which required ACA to conduct reviews of annual compliance, policies, procedures, and documents, with Chatham as a third-party beneficiary.  Id. ¶¶ 18–20, 22, 24.  ACA touted this service on its website, where it described a "mock exam" that would allow clients to "know what to expect" and "address any deficiencies."  Id. ¶ 19.  ACA also agreed to draft and revise policies and procedures and provide SEC examination support, including assistance for staff presentations and preparation for employee interviews.  Id. ¶¶ 18, 21, 23.

Since 2003, Chatham has acquired concentrated positions in credits offered by distressed companies and managed these assets through privately held high-yield funds.  Id. ¶¶ 25–26.  In 2013, Chatham expanded operations by managing assets through publicly registered liquid alternative funds, which imposed more stringent requirements, such as restrictive issuer and industry concentration limits.  Id. ¶¶ 26–27.  In response to these restrictions, Chatham decided to spread a concentrated investment in American Media, Inc. among different funds that it managed (the "Rebalancing Trades").  Id. ¶¶ 28–29.  However, Chatham recognized that the Rebalancing Trades posed compliance challenges because the Investment Company Act prohibits transactions between registered investment companies and affiliated persons.  Id. ¶¶ 30–31.  Chatham's Chief Operating and Compliance Officer therefore turned to ACA's Lead Engagement Partner, who suggested that the interposition of broker-dealers would circumvent this prohibition.  Id. ¶¶ 31–32.  ACA's Lead Engagement Partner was a co-founder who had extensive experience at the SEC and then ACA, which held itself out as the leading compliance expert for investment advisory firms.  Id. ¶¶ 31, 35, 38.  Thus, Chatham's Managing Partner relied on his advice to execute the Rebalancing Trades.  Id. ¶¶ 33, 37–38.

Ultimately, Chatham learned that ACA's advice contradicted past and then-current SEC precedents, which made clear that the interposition of broker-dealers could not cleanse transactions between registered investment companies and affiliated persons.  Id. ¶¶ 34–36.  According to Chatham, ACA had numerous opportunities to detect and correct its error but failed to do so.  For example, ACA conducted annual compliance program reviews and mock audits, which were intended to identify compliance issues with respect to the Investment Advisers Act, the Investment Company Act, internal policies and procedures, best practices, and regulatory expectations.  Id. ¶ 39.  In conducting these reviews, ACA interviewed employees and reviewed Chatham's books and records, policies and procedures, and compliance documents.  Id. ¶ 40.  ACA also had access to Chatham's trading system, electronic communications, Bloomberg chats, and all information it requested.  Id.  Although ACA conducted these reviews in 2017 and 2018, it failed to flag the hundreds of Rebalancing Trades that occurred after 2016.  Id. ¶¶ 41–50.

Likewise, ACA failed to address the Rebalancing Trades in connection with the SEC examination that occurred in 2018.  Id. ¶¶ 51–61.  In May 2018, the SEC notified Chatham that it would conduct an onsite examination, and in June 2018, Chatham's Chief Operating and Compliance Officer participated in a "pre-exam" call with the SEC.  Id. ¶¶ 51, 53.  In these communications, the SEC not only requested information and documents, but also inquired into whether Chatham conducted cross trades among the funds its managed.  Id.  The previous year, the SEC had announced that controls over cross trading was a priority for the agency.  Id. ¶ 55.  Despite this development—and despite its involvement from the outset and its participation in the pre-exam call—ACA did not flag the Rebalancing Trades.  Id. ¶¶ 52–55.  Nor did ACA address the Rebalancing Trades during the onsite examination, which ACA's Lead Engagement Partner attended.  Id. ¶¶ 56, 58.  Instead, ACA only began to scrutinize the Rebalancing Trades after the

SEC requested information about these transactions and indicated that it would return for another onsite examination.  Id. ¶ 57.  Specifically, ACA used proprietary software to scrutinize the Rebalancing Trades but failed to find any issues.  Id. ¶ 59.  Thus, ACA failed to prepare Chatham for the subsequent onsite examination, which took place October 2018.  Id. ¶¶ 60–61.

By 2019, Chatham suffered consequences as a result the SEC examination.  First, the SEC inquiry was leaked to the public, and investors responded by redeeming existing investments and refraining from making further investments.  Id. ¶ 62.  Second, Chatham received a deficiency letter from the SEC, which proceeded to initiate an investigation despite explanations of ACA's advice and reviews.  Id. ¶¶ 63–66.  The investigation culminated in a settlement agreement that Chatham and the SEC executed on April 3, 2023.  Id. ¶ 67.  Due to the settlement, Chatham suffered reputational and monetary harm, as the public terms of the agreement required payment of $11 million in disgorgement, $3.375 million in interest, and $4.4 million in penalties.  Id. ¶¶ 67–69.

On April 17, 2023, Chatham filed this lawsuit against ACA for breach of the non-privileged agreement, breach of the privileged agreement, gross negligence, negligent misrepresentation, and breach of fiduciary duty.  Id. ¶¶ 70–102.  ACA moved to dismiss, ECF No. 13, and Chatham opposed the Motion, ECF No. 20.

## II.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for failure to state a claim to relief.  Fed. R. Civ. P. 12(b)(6).  For purposes of a motion to dismiss, the district court accepts the facts alleged in the complaint as true and draws all reasonable inferences in favor of the non-moving party.  N.J. Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J., 760 F.3d 297, 302 (3d Cir. 2014).  While the complaint need not contain

detailed factual allegations, Fed. R. Civ. P. 8(a), it must contain "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The complaint is facially plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, "conclusory or bare-bones allegations will no longer survive a motion to dismiss." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (citations omitted).

## III. ANALYSIS

### A. Breach of Contract

As a preliminary matter, ACA argues that the claims for breach of contract are barred by the Delaware statute of limitations. ECF No. 13.1 at 23–26. Chatham responds that New Jersey law applies and that the Delaware statute of limitations is subject to equitable tolling. ECF No. 20 at 24–28, 30–32.[1]

The Court agrees with ACA that the claims for breach of contract are untimely. "Statutes of limitations are substantive," Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 160–61 (3d Cir. 2001), and federal courts with diversity jurisdiction must "apply the relevant state's substantive law, which includes its statute of limitations," Jaworowski v. Ciasulli, 490 F.3d 331, 333 (3d Cir. 2007). To determine the relevant state for an area of substantive law, "a court sitting in diversity will apply the choice-of-law principles of the forum state (here, New Jersey)." Zydus Worldwide DMCC v. Teva API Inc., 461 F. Supp. 3d 119, 131 (D.N.J. 2020). Under principles of New Jersey law, "when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New

[1] The parties also dispute whether the Complaint adequately alleges breach of a specific provision or damages. ECF No. 13.1 at 26–29; ECF No. 20 at 34–35, 46–47.

Jersey's public policy." Instructional Sys., Inc. v. Computer Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992). Here, Chatham and ACA agreed that the non-privileged and privileged agreements would be "governed by, and construed in accordance with, the laws of the State of Delaware," Compl. at Exs. A, B ¶ 8, and there is no indication that this choice contravenes New Jersey's public policy. Therefore, Delaware law applies to the contract claims, including the statute of limitations,[2] which requires a "contract action [to] be brought within three years from the date that the cause of action accrued." Levey v. Brownstone Asset Mgmt., LP, 76 A.3d 764, 768 (Del. 2013). Since this cause of action accrued "at the time of the wrongful act[s]," Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 860 A.2d 312, 319 (Del. 2004), which occurred more than three years before this action was brought,[3] the claims for breach of contract are barred by the Delaware statute of limitations.

---

[2] The Court is unconvinced by Chatham's argument that New Jersey law applies. The Third Circuit has held that "[c]hoice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." Gluck v. Unisys Corp., 960 F.2d 1168, 1179 & n.8 (3d Cir. 1992). While some courts in this District have adopted the holding, see, e.g., Greene v. Midland Credit Mgmt., Inc., Civ. No. 17-1322, 2019 WL 102410, at *3 (D.N.J. Jan. 3, 2019), it is predicated on "the federal conflicts rule," rather than principles of New Jersey law, Pazymino v. Portfolio Recovery Assocs., LLC, Civ. No. 17-1322, 2019 WL 102410, at *3 (D.N.J. Jan. 3, 2019). Indeed, other courts in this District have relied on principles of New Jersey law to place statutes of limitations within the purview of choice of law provisions. See, e.g., Curtiss-Wright Corp. v. Rodney Hunt Co., Inc., 1 F. Supp. 3d 277, 286 (D.N.J. 2014); Bulut v. JPMorgan Chase Bank, N.A., Civ. No. 22-4276, 2023 WL 869402, at *7 (D.N.J. Jan. 27, 2023). In the case cited by Chatham, a court in this District excluded a statute of limitations from a choice of law clause pursuant to New Jersey law. See Miller v. Butler, Civ. No. 12-1004, 2014 WL 200646, at *3 (D.N.J. Jan. 15, 2014). However, the case cited therein concerned "questions of who can practice before the New Jersey courts," which are "matters of practice rather than questions of substantive law." Kramer v. Ciba-Geigy Corp., 854 A.2d 948, 961 (N.J. Super. Ct. App. Div. 2004) (citations omitted).

[3] The Court is equally unconvinced by Chatham's argument that the Delaware statute of limitations is subject to equitable tolling. "[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." Lebanon Cnty. Employees' Ret. Fund v. Collis, 287 A.3d 1160, 1217 (Del. Ch. 2022) (citing In re Tyson Foods, Inc., 919 A.2d 563, 585 (Del. Ch. 2007)). However, "a plaintiff bears the burden of showing that the statute was tolled," and "no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." Tyson, 919 A.2d at 585. Chatham has not satisfied the burden of showing that the statute was tolled, as the allegations suggest that it should have been aware of the wrong by at least 2019, when the SEC proceeded with an investigation despite explanations of ACA's advice and reviews. For the same reason, there is no indication that "the injury

Accordingly, the Motion is **GRANTED** as to Counts One and Two.[4]

**B. Remaining Claims**

ACA argues that the remaining claims are also barred by the Delaware statute of limitations and that relief for these claims is precluded by the economic loss doctrine. ECF No. 13.1 at 23–26, 29–31. Chatham responds that the choice of Delaware law extends only to the contract claim and that the allegations point to wrongdoing beyond that claim. ECF No. 20 at 29–32, 36–39.

The Court agrees with Chatham that the remaining claims are not barred by the Delaware statute of limitations. When confronted with a nearly identical choice of law provision, the Third Circuit held that the language was "narrowly drafted to encompass only the underlying . . . agreement itself, and not . . . the entire relationship" of the parties. Black Box Corp. v. Markham, 127 Fed. Appx. 22, 25 (3d Cir. 2005). Although this holding "is non-precedential, it is instructive," Portillo v. Nat'l Freight, Inc., 323 F. Supp. 3d 646, 654 (D.N.J. 2018),[5] as courts in this District have consistently interpreted substantially similar choice of law clauses to encompass only

---

[was] inherently unknowable and [that] the claimant [was] blamelessly ignorant of the wrongful act." Boerger v. Heiman, 965 A.2d 671, 674 (Del. 2009) (citing Coleman v. Pricewaterhousecoopers, LLC, 854 A.2d 838 (Del. 2004)). Indeed, Chatham has not demonstrated that it had an "inability to acquire by other means" information about the legality of the Rebalancing Trades. Coleman, 854 A.2d at 842. To the contrary, the allegations suggest that ACA's erroneous advice contravened extensive and clear SEC precedents and priorities.

[4] Since the claims are untimely, the Court need not consider the adequacy of the allegations concerning breach and damages.

[5] In a precedential opinion, the Third Circuit held that "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms." Crescent Int'l, Inc. v. Avatar Communities, Inc., 857 F.2d 943, 944–45 (3d Cir. 1988). However, that case is distinguishable because here "the gravamen of [the remaining] claims does not center on the terms of the contract," Portillo, 323 F. Supp. at 655 n.5 (emphasis omitted), but rather on violations of independent duties, see infra at 8 n.6. Moreover, a forum selection clause is not synonymous with a choice of law provision, and the language of the clause in that case differs significantly from the language of the provision here. See Crescent, 857 F.2d at 944 (citations omitted) ("[A]ny litigation upon any of [the contract's] terms . . . shall be maintained in a state or federal court in Miami, Florida.")

underlying agreements, not other non-contractual claims, see, e.g., Fagan v. Fischer, Civ. No. 14-7013, 2019 WL 5587286, at *7 (D.N.J. Oct. 30, 2019); Estate of Cotton v. Senior Planning Servs., LLC, Civ. No. 19-8921, 2020 WL 7022740, at *11 (D.N.J. Nov. 30, 2020); Universal Prop. Servs. Inc. v. Lehigh Gas Wholesale Servs., Inc., Civ. No. 20-3315, 2021 WL 118940, at *11 (D.N.J. Jan. 13, 2021). Plainly, Delaware law does not apply to the remaining claims.

The Court also agrees with Chatham that relief for the remaining claims is not precluded by the economic loss doctrine. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." Namerow v. PediatriCare Associates, LLC, 218 A.3d 839, 846 (N.J. Super. Ct. Ch. Div. 2018). However, New Jersey law permits recovery "when a defendant 'owe[s] a duty of care separate and apart from the contract between the parties.'" Wilson v. RoundPoint Mortgage Servicing Corp., Civ. No. 21-19072, 2022 WL 3913318, at *3 (D.N.J. Aug. 31, 2022) (alterations in original) (citing Saltiel v. GSI Consultants, Inc., 788 A.2d 268, 279 (N.J. 2002)). For example, New Jersey law imposes duties on certain professionals that "can be enforced separately and apart from contractual obligations." Saltiel, 788 A.2d at 280–81. Chatham adequately alleges that ACA assumed such duties independent of the non-privileged and privileged agreements.[6] Even if the "parties' relationship [was] governed by [these] comprehensive contractual agreement[s]," Wilson, 2022

[6] "Ability to foresee injury . . . is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc., 638 A.2d 1288, 1294 (N.J. 1994). Because ACA held itself out as a compliance expert with considerable experience, it had the ability to foresee that clients such as Chatham could have been injured by erroneous compliance advice. Nor do "fairness and policy" indicate that imposition of a duty of care is inappropriate. Carvalho v. Toll Bros. & Developers, 675 A.2d 209, 212 (N.J. 1996). Indeed, courts in this District regularly assume that New Jersey law imposes a duty of care on professional consultants whose role is to ensure that clients' practices are compliant with regulations. See e.g., Grand St. Artists v. Gen. Elec. Co., 19 F. Supp. 2d 242, 248 (D.N.J. 1998); Borough of Edgewater v. Waterside Constr., LLC, Civ. No. 14-5060, 2021 WL 4059850, at *5 (D.N.J. Sept. 3, 2021); Ford Motor Co. v. Edgewood Properties, Inc., Civ. No. 06-1278, 2012 WL 4172133, at *19–20 (D.N.J. Aug. 31, 2012). Moreover, ACA owed a duty to Chatham in a fiduciary capacity. See infra at 11–12.

WL 3913318, at *3, it is not clear that all of ACA's alleged wrongdoing was governed by the substantive terms thereof, see Compl. at Exs. A, B, C ¶ 1.[7] In any event, since the contractual claims cannot proceed at this stage of the litigation, "it would be prejudicial to [Chatham] if the Court were to dismiss the [remaining] claims." IDT Corp. v. Unlimited Recharge, Inc., Civ. No. 11-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012).[8]

Accordingly, the Court turns to the substance of the claims for gross negligence, negligent misrepresentation, and breach of fiduciary duty.

**a. Gross Negligence**

ACA argues that Chatham fails to state a claim for gross negligence because the factual allegations do not support even an inference of ordinary negligence. ECF No. 13.1 at 32–33. Chatham responds that the allegations include sufficient facts to demonstrate gross negligence on the part of ACA. ECF No. 20 at 39–40.

The Court agrees with Chatham. "Gross negligence has the same elements as ordinary negligence because [n]egligence differs from gross negligence only in degree, not in kind." Zelnick v. Morristown-Beard Sch., 137 A.3d 560, 567 (N.J. Super. Ct. Law Div. 2015) (alteration in original) (citations omitted). "Whereas negligence is the failure to exercise ordinary or reasonable care that leads to a natural and probable injury, gross negligence is the failure to exercise slight care or diligence." Steinberg v. Sahara Sam's Oasis, LLC, 142 A.3d 742, 754 (N.J. 2016) (citations omitted). Here, Chatham alleges that ACA offered erroneous advice that resulted in SEC scrutiny, precipitating lost investments and a public settlement that required nearly $19

---

[7] For example, it is not clear that the communication from ACA's Lead Engagement Partner to Chatham's Chief Operating and Compliance Officer was a performance of either contract.

[8] If the Court subsequently finds that the contractual claims can proceed, then the parties "may revisit [the economic loss doctrine] at a later stage in this litigation." IDT, 2012 WL 4050298, at *6.

million in payments. Furthermore, Chatham alleges that ACA's advice contravened extensive and clear SEC precedents and priorities and that ACA failed to detect and correct its error despite numerous opportunities to do so. These factual allegations support the inference that ACA failed to exercise slight care or diligence and that Chatham suffered natural and probable injury as a result of this failure.[9] Although discovery may reveal otherwise, the cause of action can proceed at this stage of this litigation.

Accordingly, the Motion is **DENIED** as to Count Three.

**b. Negligent Misrepresentation**

Relatedly, ACA argues that Chatham fails to state a claim for negligent misrepresentation because the parties' agreements bar negligence claims and the factual allegations do not establish that Chatham received or relied on advice from ACA to pre-arrange the Rebalancing Trades at fixed prices. ECF No. 13.1 at 33–36. Chatham responds that the content of the advice from ACA is a factual question better suited for the merits stage. ECF No. 20 at 32–34, 41–42.

The Court agrees with Chatham. A negligent misrepresentation is "[a]n incorrect statement, negligently made and justifiably relied upon, [and] . . . economic loss or injury sustained as a consequence of that reliance." Green v. Morgan Properties, 73 A.3d 478, 493–94 (N.J. 2013) (alterations in original) (citations omitted). Here, each element has been pled. First, Chatham alleges that ACA's Lead Engagement Partner made an incorrect statement about the interposition of broker-dealers in transactions between registered investment companies and affiliated persons despite obvious SEC precedents to the contrary. Second, Chatham alleges that its Chief Operating and Compliance Officer relied upon that statement because ACA held itself out as a compliance

[9] The parties do not appear to dispute the existence of a duty of care. See ECF No. 21 at 10 (citations omitted) (emphasis added) ("[T]he Complaint plainly fails to allege an extreme departure from the ordinary standard of care[.]).

expert with considerable experience. Third, Chatham alleges that it sustained economic loss as a consequence of its reliance on ACA.[10] Again, discovery may reveal that Chatham pre-arranged the Rebalancing Trades at fixed prices without receiving or relying on corresponding statements from ACA, but factual disputes are not properly adjudicated at the pleading stage.

Accordingly, the Motion is **DENIED** as to Count Four.

**c. Breach of Fiduciary Duty**

Finally, ACA argues that Chatham fails to state a claim for breach of fiduciary duty because the parties' agreements disclaim a fiduciary relationship, which cannot otherwise be inferred from the factual allegations. ECF No. 13.1 at 36–38. Chatham responds that any disclaimer is not dispositive and that the allegations include sufficient facts to demonstrate that ACA was a fiduciary. ECF No. 20 at 42–44.

The Court agrees with Chatham. "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." F.G. v. MacDonell, 696 A.2d 697, 703–04 (N.J. 1997). Here, the "allegations are sufficient for [Chatham] to be able to demonstrate it reposed trust in [ACA's] superior skill and knowledge," as "[ACA] provided advice upon which it knew [Chatham] would rely in making important decisions." In re Cendant Corp. Sec. Litig., 139 F. Supp. 2d 585, 610 (D.N.J. 2001). Specifically, the allegations show that ACA presented itself as an expert and then offered advice upon which Chatham relied. See Jeffrey Rapaport M.D., P.A. v. Robin S. Weingast & Associates, Inc., 859 F. Supp. 2d 706, 718–19 (D.N.J. 2012) ("[T]hose who represent themselves as experts in a field and invite the reliance of another party on such expertise may be found to owe that party a duty to do so with the

[10] While Chatham agreed to limit liability to "gross negligence, willful misconduct or fraudulent behavior," Compl. at Exs. A, B ¶ 5, the factual allegations support an inference that the misrepresentation was advanced as a result of gross negligence.

requisite degree of care."). These allegations imply that Chatham "can, with discovery, prove some set of facts in support of its claim that a fiduciary relationship exists" with ACA. Sunset Fin. Res., Inc. v. Redevelopment Grp. V, LLC, Civ. No. 05-2914, 2006 WL 3675384, at *7 (D.N.J. Dec. 12, 2006).[11]

Accordingly, the Motion is **DENIED** as to Count Five.[12]

## IV. CONCLUSION

For the reasons set forth herein, the Motion is **GRANTED** in part and **DENIED** in part**.** The Motion is **GRANTED** as to Counts One and Two and **DENIED** as to Counts Three, Four, and Five. Counts One and Two are **DISMISSED** without prejudice to the filing of an Amended Complaint within thirty days that addresses the deficiencies set forth herein.

[11] While the parties agreed to disclaim a "fiduciary relationship," Compl. at Exs. A, B ¶ 2, that disclaimer only applied to the relationship as created by the agreements, id. Moreover, the case cited by ACA does not illustrate that waivers of fiduciary relationships are enforceable in New Jersey. See Lamme v. Client Instant Access, LLC, 2022 WL 1276123 (N.J. Super. Ct. App. Div. Apr. 29, 2022). That case involved the corporate waiver of a duty within an existing fiduciary relationship, and the court only enforced the term because it was contemplated by the corporate statutes. Id. at *2.

[12] The parties do not appear to dispute the other elements of this cause of action. See ECF No. 21 at 12–13 (citing all four elements under New Jersey law but only contending that the first element is unsatisfied).